568 F.2d 1025
 96 L.R.R.M. (BNA) 2440, 82 Lab.Cas. P 10,148
 AMALGAMATED TRANSIT UNION, DIVISION 819, Division 820,
Amalgamated Transit Union, Division 821, Amalgamated Transit
Union, Division 822, Amalgamated Transit Union, Division
823, Amalgamated Transit Union, Division 824, Amalgamated
Transit Union, Division 825, Amalgamated Transit Union,
Division 880, Amalgamated Transit Union, Division 1248,
Amalgamated Transit Union, Division 1276, Amalgamated
Transit Union, Division 1317, Amalgamated Transit Union,
Division 1358, Amalgamated Transit Union, Division 1478,
Amalgamated Transit Union, Division 1530, Amalgamated
Transit Union, Division 1541, Appellants,
v.
BYRNE, Brendan T., Individually and in his capacity as
Governor of the State of New Jersey, Alan Sagner,
Individually and in his capacity as Commissioner of
Transportation of the State of New Jersey and as Chairman of
the Commuter Operating Agency, and their agents, assigns,
and successors.
 No. 76-2050.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 4, 1977.
Reargued In Banc, May 12, 1977.
Submitted on Supplemental Briefs July 15, 1977.
Decided Sept. 22, 1977.
 
 Bernard Cushman, Julia Penny Clark, Bredhoff, Cushman, Gottesman & Cohen, Earle W. Putnam, Washington, D. C., for appellants.
 William F. Hyland, Atty. Gen. of N. J., Trenton, N. J., for appellees; Erminie Conley, Deputy Atty. Gen., Trenton, N. J., of counsel; Larry Filler, Kenneth S. Levy, Deputy Attys. Gen., Trenton, N. J., on the brief.Argued Jan. 4, 1977
 Before ALDISERT and WEIS, Circuit Judges, and HUYETT, District Judge.
 Reargued in banc May 12, 1977
 Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 This case poses the question of whether officials of the State of New Jersey violated the federal policy of allowing the content of collective bargaining agreements to be determined "by the free play of economic forces" when they threatened to withdraw State subsidies of private transportation companies which agree with their unions to include unlimited cost of living increases in their collective bargaining agreements. NLRB v. Nash-Finch Co., 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971). The district court concluded that the complaint filed by the plaintiffs-appellants, who are 15 local unions of the Amalgamated Transit Union representing the employees of various transportation companies, failed to state a claim on which relief could be granted. In determining the soundness of the district court's decision, we are thus obligated to accept the allegations of the complaint as true.
 
 
 2
 The State of New Jersey provides subsidies to certain privately owned transportation companies under the following statute:
 
 
 3
 The Department of Transportation is hereby authorized to contract with any motor bus carrier operating bus or rail transit service in the State which is in imminent danger of terminating all bus services or all rail transit services provided by said motor bus companies to insure the continuance of that portion of the bus and rail transit services which is essential. Payment by the department under such a contract shall not exceed the actual cost to the motor bus carrier for providing such services and shall not include any return on investment. 27 N.J.Stat.Ann. § 1 A-28.7 (Supp.1977).
 
 
 4
 During late 1975, individual contract negotiations began between representatives of certain transportation companies and the relevant plaintiff unions, looking toward new labor contracts to succeed those which were about to expire. The complaint asserts that:
 
 
 5
 In the midst of these negotiations the defendant Commissioner of Transportation, Alan Sagner, injected the State into these negotiations. Specifically, he called a meeting on January 9, 1976 of those local union officials involved in negotiations. He announced on that occasion that the State would not continue its policy of subsidizing troubled private transit companies if the unions insisted on retaining the "uncapped cost of living" clause (whereby wages are periodically adjusted to fully reflect increases in the cost of living as calculated by the Department of Labor) in their contracts with such companies. The defendant Sagner and Lewis Kaden, Counsel to Governor Byrne and his authorized representative, next met with the International President and other union officials . . . in Washington, D. C. on February 6, 1976. Kaden stated to them that the State of New Jersey objected to the cost of living principle as it existed in current contracts and was going to "destroy" it. Further, Kaden and Sagner said that the State would not assist by way of subsidy those private transit companies that agreed to such cost of living increases in any contracts which might result from the then ongoing negotiations.
 
 The complaint also asserts that:
 
 6
 In March, 1976, company negotiators told their Union counterparts at the bargaining table that their companies had been instructed by state officials that the current cost of living clauses in their contracts could not be retained in future contracts. In at least one instance a company official said that he had also been told by state officials that any wage increases for employees of the companies could not exceed those granted State employees or else there would be no further state subsidy assistance for those financially troubled companies. The unions in each case vigorously objected to such positions and negotiations reached an impasse. As a result, strikes occurred (at the companies in March of 1976).
 
 
 7
 During the strikes the defendant Brendan T. Byrne, Governor of New Jersey, publicly reiterated the prior statements of the defendant Alan Sagner . . . that the State would not assist a private transit company which retained the cost of living clause in its labor agreements. In addition, the defendant Sagner distributed to both management and labor a written statement which indicated that increases in salaries and benefits beyond those granted State employees would not be permissible if the companies desired to continue receiving state financial assistance.[1]
 
 
 8
 Plaintiffs request a judgment declaring that the conduct of defendants Byrne and Sagner violated the Supremacy Clause of the Constitution because it infringed on federal labor policy as embodied in the National Labor Relations Act. They also seek parallel temporary and permanent injunctive relief.
 
 
 9
 We note preliminarily that the allegations of the complaint are sufficient to sustain subject matter jurisdiction under 28 U.S.C. § 1337, since the NLRA is an "Act of Congress regulating Commerce." Our conclusion is supported by American Federation of Labor v. Watson, 327 U.S. 582, 66 S.Ct. 761, 90 L.Ed. 873 (1946), where the Court took § 1337 jurisdiction of a case in which the plaintiffs alleged "a conflict between the Florida law and the National Labor Relations Act." 327 U.S. at 591, 66 S.Ct. at 765.
 
 
 10
 Turning to the legal sufficiency of the claims, we first note that plaintiffs do not contend that the defendants have violated the specific terms of any provision of the NLRA. Consequently, we consider whether their claim can be said to be otherwise incompatible with the NLRA.
 
 
 11
 As Justice Frankfurter stated in International Ass'n. of Machinists v. Gonzales, 356 U.S. 617, 619, 78 S.Ct. 923, 924, 2 L.Ed.2d 1018 (1958): "the statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation." Moreover, Supreme Court cases on preemption in the labor field do not seem precisely on point here because they have apparently all involved direct state regulation of private conduct, whereas in the present case New Jersey has not directly commanded or prohibited the conduct of third parties but has merely sought to influence private conduct by threatening to withhold discretionary subsidies.
 
 
 12
 Nevertheless, the Supreme Court's statements on the preemption question, within and without the field of labor relations, do provide a framework for the resolution of the question before us. The Court recently addressed the scope of preemption in the labor field in Lodge 76, International Ass'n. of Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 96 S.Ct. 2548, 2552, 49 L.Ed.2d 396 (1976). The Court stated that its preemption cases fall into two categories cases involving the primary jurisdiction of the NLRB, where the concern is that "one forum would enjoin, as illegal, conduct which the other forum would find legal," and cases in which state law has infringed upon "rights guaranteed by the Federal Acts" even though the state may not have attempted to regulate conduct which is specifically protected or prohibited under federal law. Automobile Workers v. Russell, 356 U.S. 634, 644, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958), quoted in Lodge 76, International Ass'n. of Machinists v. Wisconsin Employment Relations Commission, 427 U.S. at 138, 96 S.Ct. 2548.
 
 
 13
 Plaintiffs' argument here rests on the second line of cases.[2] Their contention is, in essence that New Jersey has endeavored to dictate the substantive terms of collective bargaining agreements when the NLRA envisages that the substance of such agreements will be determined "by the free play of economic forces." NLRB v. Nash-Finch Co., 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971); see NLRB v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). It cannot be doubted that New Jersey would be barred under the Supremacy Clause from prohibiting private parties from agreeing to unlimited cost of living clauses in their collective bargaining agreements. But New Jersey has merely threatened to withdraw subsidies from companies that grant such clauses, and this circumstance requires us to scrutinize more closely the nature of the rights guaranteed plaintiffs under the NLRA, and the question of whether the State's action stands as an impermissible obstacle to the full realization of these rights.
 
 
 14
 In Florida Lime and Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the Supreme Court stated that there is a presumption that state authority has not been ousted by Congressional action:
 
 
 15
 (F)ederal regulation . . . should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.
 
 
 16
 The Court further elaborated its view on preemption of state regulation in DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). State authority will, of course, be preempted if Congress has clearly intended to oust states of their power in the area in question. But the NLRA does not explicitly call for preemption of all state authority indeed, as Justice Frankfurter remarked, the statutory implications concerning the extent of remaining state authority are "Delphic." The Act certainly does not address the permissibility of New Jersey's action in the present case. On the other hand, state authority will also be preempted if the nature of the subject matter requires exclusive federal authority, or if a particular state law "stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress" in enacting the legislation in question. Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 17
 We believe that the touchstone of these bases of preemption must also be Congressional intent to preempt, though this intent is inferred or presumed from the nature of the federal action rather than made explicit in the statute or legislative history. That a presumption as to Congressional intent is fundamental to preemption in cases where the nature of the subject matter is thought to require exclusive federal authority is evident from the opinion in DeCanas v. Bica, supra : the Court said that Congressional "intent" to preempt state authority could not be "derived" from the comprehensiveness of the federal scheme involved, the Immigration and Nationality Act. 424 U.S. at 359, 96 S.Ct. 933, 938. With respect to cases where it is alleged that specific state legislation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," we again conclude that it must be reasonable to presume that Congress would have intended to preclude the state action in question. Cases which have involved state mandatory regulation of private conduct, as opposed to subsidies, have not necessitated that this question be directly addressed, since any time state legislation establishes requirements which conflict with the federal scheme, state law must inevitably be preempted to effectuate the aims of the federal scheme.[3] But it would make little sense to preempt state law in order to serve the purposes underlying federal legislation if Congress itself would not require or admit of preemption of state authority.
 
 
 18
 We do not believe that it is fair to imply that Congress would intend to bar New Jersey's conduct in this case as an impermissible infringement upon the rights guaranteed by the NLRA. In the first place, we do not believe that New Jersey's action here constitutes the governmental attempt to dictate the substance of collective bargaining agreements which is forbidden by NLRB v. Insurance Agents, supra, and other cases. The statutory framework under which the Department of Transportation is authorized to provide "payment(s)" to private transportation companies states twice that the Department may "contract" with the private companies, and also states that the payments shall be "for providing such services." This implies that the private companies are under obligation to deliver the transportation services for which they are paid. Thus, New Jersey's interest in the collective bargaining agreements is similar to that of any private purchaser of services which expresses an interest in the terms of a collective bargaining agreement under consideration by the provider of the services. New Jersey, like the private consumer, is attempting to exert pressure on the parties to the collective bargaining negotiations in order to hold down the costs of purchasing the "essential" transportation services these companies provide.
 
 
 19
 The NLRA only proscribes the activities of private parties if they are "employer(s)" or "labor organization(s) or (their) agents." New Jersey cannot be described here as a "labor organization." Moreover, even accepting as we do not the factual soundness of describing New Jersey as an "employer" when it purchases the transportation services provided by private transportation companies, the statutory definition of the term "employer" specifies that it does not include "any State or political subdivision thereof." 29 U.S.C. § 152 (Supp.1977). Thus, to the extent that New Jersey is here acting like a private purchaser of services, Congress has explicitly exempted it from the proscriptions of the NLRA.
 
 
 20
 We do not believe that viewing the State as a private consumer is improper because it would allow unduly broad state interference in labor activity. Even if it should be proved that states have a direct financial stake in a broad range of private concerns, we feel that a determination that states must be treated differently from private companies because of the pervasiveness of their financial interests is itself the type of policy decision which should be made by Congress, especially in view of the presumption in favor of state authority.
 
 
 21
 But even apart from the argument that New Jersey's conduct is similar to conduct which is permissible when engaged in by private third parties, and accepting the contention that the State is acting in a peculiarly governmental capacity, we do not believe that the State's present conduct, as opposed to state regulation which is mandatory upon private parties, is an impermissible violation of the unions' right to be free of governmental dictate as to the substantive terms of their collective bargaining agreements.[4] See NLRB v. Insurance Agents, supra.
 
 
 22
 New Jersey has asserted an interest in having transportation services provided to the public rather than a broad interest in labor relations per se, as was the case in General Electric Co. v. Callahan, 294 F.2d 60 (5th Cir. 1961), petition for cert. dismissed, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962). See also Oil, Chemical & Atomic Workers v. Arkansas Louisiana Gas Co., 332 F.2d 64 (10th Cir. 1964). In Callahan, the Massachusetts' Board of Conciliation and Arbitration had begun to investigate a labor controversy under a statutory framework which authorized the Board to issue a written report as to "which of the parties (to the controversy) is mainly responsible or blameworthy for its existence" of the controversy; the Board was also authorized to "advise the respective parties what ought to be done or submitted to by either of both to adjust said controversy." In the present instance, however, New Jersey has merely established conditions on how it will spend its own money to insure that transportation services are provided to the public. This fact must be deemed to limit, though admittedly not entirely eliminate the significance of the influence of the State's action, and again, it is important to consider that New Jersey's interest is that of insuring that "essential" transportation services are provided to the public, rather than regulating labor relations per se.
 
 
 23
 In sum, we cannot conclude that Congress would intend to bar New Jersey from establishing the conditions under which it will pay private transportation companies to provide transportation services to the public. Under our conclusion as to Congressional intent, we need not decide whether Congress could constitutionally legislate with respect to New Jersey's interest in providing "essential" transportation service. See National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).[5] Moreover, given our decision that the complaint does not state a claim on which relief can be granted, we also do not confront the problem of whether the Norris-LaGuardia Act would bar declaratory or injunctive relief against the State. Although the Act itself speaks in jurisdictional terms and thus would appear to raise a threshold question which must be discussed before going on to the merits, precedent of this court supports our conclusion that we need not consider the issues raised by the Act, since there is a "distinction between jurisdiction to adjudicate a controversy and power to grant a particular form of relief." Bethlehem Mines Corp. v. United Mine Workers of America, 476 F.2d 860, 863 n.1 (3d Cir. 1973).
 
 
 24
 The judgment of the district court will be affirmed.
 
 
 25
 ALDISERT, Circuit Judge, dissenting, with whom WEIS, Circuit Judge, joins, and with whom JAMES HUNTER, III, Circuit Judge, also joins except for part IV. B.
 
 
 26
 The question for decision is whether a complaint filed by 15 local unions of the Amalgamated Transit Union (ATU) stated a claim upon which relief could be granted. The complaint charged that New Jersey officials impermissibly interfered in the collective bargaining process between the local unions and various transit companies by threatening to withdraw state subsidies from any transit company which provided in its collective bargaining agreement for an uncapped cost of living clause or for a wage increase for union employees higher than that given to state employees. The unions sought declaratory and injunctive relief against state interference in the negotiations. Pursuant to Fed.R.Civ.P. 12(b)(6), the district court dismissed the complaint for failure to state a claim. Because I would reverse the district court's determination, I dissent from the majority's opinion.
 
 I.
 
 27
 As the majority properly observes, on a Rule 12(b)(6) motion, the factual allegations of a complaint should be accepted by the court as true, see Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Radovich v. Nat'l Football League, 352 U.S. 445, 448, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved in support of its claims. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). These oft-stated precepts are consistent with the simplified pleading requirements of the Federal Rules of Civil Procedure, whose purpose is "to facilitate a proper decision on the merits." Conley, supra, 355 U.S. at 48, 78 S.Ct. at 103.
 
 
 28
 The present complaint alleged that for at least 25 years, plaintiff-appellant local unions engaged in collective bargaining with various privately owned transit companies in New Jersey, and that on January 9, 1976, during the parties' negotiations over new labor contracts to succeed those soon to expire, Alan Sagner, New Jersey's Commissioner of Transportation, called a meeting of union officials involved in the negotiations to announce that "the State would not continue its policy of subsidizing troubled private transit companies if the unions insisted on retaining the 'uncapped cost of living' clause in their contracts . . .." Further, it alleged that on February 6, 1976, Sagner and Lewis Kaden, Counsel to New Jersey Governor Brendan Byrne, met with union officials in Washington; that at this meeting, Kaden informed the union representatives that New Jersey "objected to the cost of living principle as it existed in current contracts and was going to 'destroy' it"; and that both Kaden and Sagner reiterated that any transit company agreeing to such cost of living clauses in the present negotiations would not receive state subsidies.
 
 
 29
 The local unions also averred that in March, 1976, transit company negotiators informed union negotiators that state officials had instructed their companies to abandon the cost of living clauses and to hold any wage increases at the level of that granted state employees, lest the state withdraw subsidy assistance from the company; that the unions objected to these positions, and negotiations reached an impasse, as a result of which strikes occurred at four transit companies; that during the strikes, Governor Byrne stated publicly that New Jersey would not subsidize any transit company which retained a cost of living clause in its labor agreements; and that Alan Sagner distributed to the negotiating parties a statement indicating that the state would not subsidize any company which granted salary and benefit increases beyond those granted state employees. Finally, it was averred that at a bargaining session occurring during the strikes, a representative of Governor Byrne stated to negotiators that "a new contract could not contain the uncapped cost of living clause as it existed in the current contract."[1]
 
 II.
 
 30
 My difference with the majority is a fundamental one, because my point of departure is a basic disagreement with its major premise "that plaintiffs do not contend that defendants have violated the specific terms of any provision of the NLRA." Maj. op. at 1027. While I readily concede that plaintiffs' complaint is not a model of pleading even under the notice pleading philosophy of the Federal Rules of Civil Procedure, the basic thrust of their claim is that the defendants
 
 
 31
 interfered with and impaired and will continue to interfere with and impair the collective bargaining process between the plaintiff unions and those privately owned companies. This interference is in conflict with federal law and policy favoring free and unfettered private collective bargaining. . . .
 
 
 32
 Complaint at P 25.
 
 
 33
 I read the complaint to be a contention that defendants violated the keystone of our national labor policy, embodied in the original National Labor Relations Act of 1935 (NLRA), 29 U.S.C. § 151:
 
 
 34
 It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.
 
 
 35
 July 5, 1935, c. 372, § 1, 49 Stat. 449; June 23, 1947, c. 120, Title I, § 101, 61 Stat. 136.
 
 
 36
 Because I start with the premise that the plaintiffs have averred a specific violation of 29 U.S.C. § 151, and the majority takes a contrary premise, it becomes quickly apparent that our separate approaches will not be reconcilable.[2]
 
 A.
 
 37
 As originally passed and as amended in 1947, the NLRA reflects a careful balancing of the differing powers and viewpoints of labor and management. See Local 1976, Carpenters v. NLRB, 357 U.S. 93, 99-100, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). Concerned that the inequality of bargaining power between employers and employees threatened the national economy and industrial peace, Congress encouraged "practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions . . .." 29 U.S.C. § 151.
 
 
 38
 In enacting the NLRA, Congress acknowledged that the legislation "preempts the field that the act covers insofar as commerce within the meaning of the act is concerned." H.R.Rep.No. 245, 80th Cong., 1st Sess. 44 (1947). But the Act was "more noticeable for its generality than for its precise prescriptions," H. K. Porter Co. v. NLRB, 397 U.S. 99, 100, 90 S.Ct. 821, 822, 25 L.Ed.2d 146 (1970), and the limitations on state authority to regulate conduct in the labor sector emerged gradually as the courts construed the purpose of the statute. See Garner v. Teamsters Local 776, 346 U.S. 485, 488, 74 S.Ct. 161, 98 L.Ed. 228 (1953); Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 771-72, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947).
 
 
 39
 A state may not impinge on conduct which is protected under section 7 of the Act, 29 U.S.C. § 157, nor may a state sanction conduct which is prohibited as an unfair labor practice under section 8, 29 U.S.C. § 158. See Motor Coach Employees v. Lockridge, 403 U.S. 274, 292, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); Hanna Mining Co. v. Marine Engineers, 382 U.S. 181, 187, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244-45, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Nor may state law interfere with rights implicitly guaranteed by the NLRA, even though the state conduct is not expressly prohibited, or the activity specifically protected, by the Act. The congressional intent, as perceived by the Supreme Court, was that certain conduct be privileged against state regulation. Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), quoting NLRB v. Nash-Finch Co., 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971); Hanna Mining Co. v. Marine Engineers, 382 U.S. 181, 187, 86 S.Ct. 327, 15 L.Ed.2d 254 (1965).
 
 
 40
 "An appreciation of the true character of the national labor policy expressed in the NLRA and the LMRA indicates that in providing a legal framework for union organization, collective bargaining and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests." Id. at 140 n.4, 96 S.Ct. at 2553, quoting Cox, Labor Law Preemption Revisited, 85 Harv.L.Rev. 1337, 1352 (1972). State attempts to regulate these same interests must fall if they disturb the balance contemplated by Congress. See Teamsters Local 20 v. Morton, 377 U.S. 252, 259-60, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).
 
 B.
 
 41
 Appellants' right to collectively bargain with the employer transit companies, a crucial part of the "balance" and guaranteed under section 7 of the Act, 29 U.S.C. § 157, is accompanied by a duty to bargain in good faith, as defined in section 8, 29 U.S.C. § 158(d). But this good faith obligation "does not compel either party to agree to a proposal or require the making of a concession . . .." Id. Congress added this specific amendment in 1947 to prevent the National Labor Relations Board (NLRB) from forcing negotiating parties to accept terms rather than face unfair labor practice charges based on inferences of bad faith. The section was designed to return the Board to its originally intended administrative role,[3] and the supreme Court subsequently held, as it had even prior to the amendment, see NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893 (1937), that the Board is "without power to compel a company or a union to agree to any substantive contractual provision of a collective-bargaining agreement." H. K. Porter Co. v. NLRB, 397 U.S. 99, 102, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970). See also NLRB v. Insurance Agents, 361 U.S. 477, 490, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); NLRB v. Burns International Security Services, Inc., 406 U.S. 272, 287, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).
 
 
 42
 This understanding that collective bargaining must be free from governmental control is applicable to the states as well as to the NLRB. The Supreme Court has given directions in this regard, and has not hesitated to vindicate the supremacy clause when state interests collide with the federal labor policy announced in the NLRA. Thus, upholding the NLRB's primary jurisdiction, the Court could teach that "(t)he ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy." Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962).
 
 
 43
 Holding that a state antitrust law could not nullify the negotiated solution of a wage problem because the application of state controls "would wholly defeat the full realization of the congressional purpose," Teamsters Local 24 v. Oliver, 358 U.S. 283, 295-96, 79 S.Ct. 297, 304, 3 L.Ed.2d 312 (1959), the Court has flatly stated that "there is no room" for a state policy which would limit "the solutions that the parties' agreement can provide to the problems of wages and working conditions." Id. at 296, 79 S.Ct. at 305. The same result was reached in Connell Construction Co. v. Plumbers and Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), in which the Court distinguished between federal and state antitrust laws. The Court reasoned that federal antitrust legislation had been carefully balanced with labor policy; that state antitrust laws generally represent a completely different balance; and, accordingly, that state regulation in this field could upset basic federal policy.
 
 
 44
 Recently presented with the question of whether Wisconsin could prohibit a union's concerted refusal to work overtime during negotiations for a new contract, the Court has instructed:
 
 
 45
 Our decisions hold that Congress meant that these activities, whether of employer or employees, were not to be regulable by States any more than by the NLRB, for neither States nor the Board are "afforded flexibility in picking and choosing which economic devices of labor and management would be branded as unlawful." Rather, both are without authority to attempt to "introduce some standard of properly 'balanced' bargaining power, . . .."
 
 
 46
 (S)tate attempts to influence the substantive terms of collective-bargaining agreements are as inconsistent with the federal regulatory scheme as are such attempts by the NLRB: "(s)ince the federal law operates here, in an area where its authority is paramount, to leave the parties free, the inconsistent application of state law is necessarily outside the power of the State."
 
 
 47
 Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, supra, 427 U.S. at 149-50, 153, 96 S.Ct. at 2557 (citations omitted).
 
 
 48
 The power and authority of a state, therefore, may not be invoked to disturb the balance of bargaining power existing between negotiating parties, nor may it be used in an effort to dictate the substantive terms of a collective bargaining agreement.[4]
 
 III.
 
 49
 Just as the states are prohibited from legislating contrary to the federal labor policy, the same prohibition extends to actions by the state executive branch. I see no distinction between the legislative and executive actions, and New Jersey does not suggest any in this appeal.
 
 
 50
 What is beyond the pale of permissible action is official activity that seeks to alter the economic forces at work or to influence the substantive terms of collective bargaining agreements. New Jersey appears to accept this premise. It nevertheless contends that here there was no state interference, that this was simply a case "where the State tells parties to a negotiation that only a certain amount of money is available for subsidization purposes," and that under these circumstances "the State has not provided additional economic weapons to one side and . . . has not removed the available weapons of the other party." Asserting that "(t)he State has determined under what financial conditions it will subsidize the carriers' operations and communicated this fact to all affected parties." the state argues, with much force, that in so doing it was discharging its responsibilities under the New Jersey Transit Subsidy Program:[5]
 
 
 51
 The State of New Jersey has carefully designed its motor bus subsidy program to provide for essential transportation needs of its citizens. This program exists outside of the occurrence of a labor dispute and is constructed to last beyond such an event. The determination that a subsidy will be offered to a carrier is discretionary with the State. It depends on various factors some of which may be of significance to collective bargaining negotiations. The fact that there is such an impact is not equivalent to saying that during the term of labor negotiations the law requires that all such considerations by the State shall be deferred.
 
 
 52
 Appellees' Brief at 19.
 
 
 53
 What this argument overlooks is that there exists a critical difference between a state communicating to all affected parties the extent of finances it intends to grant for carriers' operations and a state communicating that it will not continue its subsidization if the carriers agree with the unions to retain uncapped cost of living clauses in their employment contracts. The former communication presumably does not constitute interference with negotiations over wages and working conditions, as it is not a state attempt "to influence the substantive terms of collective bargaining agreements." But when the state has "determined under what financial conditions it will subsidize the carriers' operations" and then imposes these conditions as prerequisites to continued subsidization, the state has transformed these conditions into critical limitations on the terms of the collective bargaining agreement, and has moved beyond the pale of permissible activity. It has attempted to dictate, or at least influence, the substantive terms of the collective bargaining agreement.
 
 
 54
 By brief and at oral argument New Jersey vigorously asserted that it did not, in fact, interfere with the collective bargaining process or prescribe specific substantive terms of the resulting agreements. I cannot agree or disagree with this contention. The jurisprudential posture of this appeal requires us to accept the factual averments of the complaint as true. As averred, and if proved, New Jersey's conduct constituted interference with the collective bargaining process protected by the National Labor Relations Act. To the extent that New Jersey can rebut the factual allegations of the complaint, it may be able to prevail. In the posture of this appeal, however, that is not relevant. The issue here is solely whether the complaint states a claim upon which relief can be granted. I would hold that it does.
 
 IV.
 
 55
 The view I take requires me to meet the question whether the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., denies plaintiffs a remedy. This defense was not raised by defendants either in the district court or on appeal, but was injected sua sponte by certain members of the court during the in banc oral argument. The parties have filed post-argument briefs, and after consideration, I am persuaded that the Act does not bar labor unions from seeking relief under the circumstances at bar.
 
 A.
 
 56
 Assuming the propriety of the court meeting this issue, I believe that under no circumstances was Norris-LaGuardia designed to preclude declaratory relief. By its specific terms it precludes only injunctive relief; it denies the employer "merely of one form of remedy", Brotherhood of R.R. Trainmen v. Toledo P. & W. R.R., 321 U.S. 50, 63, 64 S.Ct. 413, 420, 88 L.Ed. 534 (1944), the injunction. See United States v. United Mine Workers, 330 U.S. 258, 270, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Whatever had been the state of the law immediately following Samuels v. Mackell, 401 U.S. 66, 69-74, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), which emphasized the similarity between injunctive and declaratory relief in the context of interfering with an ongoing state criminal prosecution, and which seemingly blurred the distinctions raised in Zwickler v. Koota, 389 U.S. 241, 254-55, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), it is clear that at least since Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the Court has been consistent in characterizing a basic difference between declaratory and injunctive relief: "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction . . .." Id., at 466, 94 S.Ct. at 1219. Thus, "even though a declaratory judgment has 'the force and effect of a final judgment,' 28 U.S.C. § 2201, it is a much milder form of relief than an injunction. Though it may be persuasive, it is not ultimately coercive; noncompliance with it may be inappropriate, but is not contempt." Id. at 471, 94 S.Ct. at 1221, quoting Perez v. Ledesma, 401 U.S. 82, 125-26, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (separate opinion of Brennan, J.). Compare Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 121-22, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); Roe v. Wade, 410 U.S. 113, 166, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Zwickler v. Koota, supra, 389 U.S. at 254, 88 S.Ct. 391 (1967); and Wooley v. Maynard, 430 U.S. 705, 710, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), with Samuels v. Mackell, supra, 401 U.S. at 69-74, 91 S.Ct. 764.[6]B.
 
 
 57
 This court is considering, in 1977, matters arising from collective bargaining negotiations which took place in the spring of 1976. The reality is that the injunction request is probably moot because of the passage of time. But assuming that the injunctive relief claim is not mooted, I would hold that Norris-LaGuardia does not preclude labor unions from seeking injunctive relief to enforce the national labor policy. I read the legislative purpose of the Act to protect the union against the employer and those standing in the employer's interests, and not vice versa. Thus, the public policy declared by the Act states:
 
 
 58
 § 102. Public policy in labor matters declared
 
 
 59
 In the interpretation of this Act and in determining the jurisdiction and authority of the courts of the United States, as such jurisdiction and authority are herein defined and limited, the public policy of the United States is declared as follows:
 
 
 60
 Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of, and limitations upon, the jurisdiction and authority of the courts of the United States are hereby enacted.
 
 
 61
 Mar. 23, 1932, c. 90, § 2, 47 Stat. 70.
 
 
 62
 "The Norris-LaGuardia Act . . . was designed primarily to protect working men in the exercise of organized, economic power, which is vital to collective bargaining." Brotherhood of R.R. Trainmen v. Chicago R. & I. R.R., 353 U.S. 30, 40, 77 S.Ct. 635, 640, 1 L.Ed.2d 622 (1957). Appellees have not cited, nor has our research uncovered, a federal court decision holding that the employer, or one standing in the interest of the employer, may interpose the defense of the Norris-LaGuardia Act to an injunction request brought by a union to protect a bargaining process. I have always perceived Norris-LaGuardia as a shield to protect union members, not as a sword to attack them. Certainly that was the perception of Senator Norris and Representative LaGuardia, who shepherded the legislation through the Senate and House.[7]
 
 
 63
 Moreover, no precedent has been cited, nor has our research discovered any federal court case holding that Norris-LaGuardia forbids the issuance of injunctions against state officials in preemption cases. In the one reported preemption case in which the issue was raised, the Norris-LaGuardia Act was held inapplicable. Almacs, Inc. v. Hackett, 312 F.Supp. 964 (D.R.I., 1970). Almacs was similar to the instant case, as it was a suit to enjoin the director of a state agency from taking action alleged to be in conflict with the NLRA. Furthermore, in many instances federal courts have granted injunctions against state officials in labor preemption cases without perceiving any Norris-LaGuardia problems. See, e. g., United Steelworkers v. Bagwell, 383 F.2d 492 (4th Cir. 1967); Oil, Chemical & Atomic Workers v. Arkansas Louisiana Gas Co., 332 F.2d 64 (10th Cir. 1964); General Electric Co. v. Callahan, 294 F.2d 60 (5th Cir. 1961), appeal dismissed, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962); Rochester Telephone Corp. v. Levine, 90 L.R.R.M. 3031 (W.D.N.Y.1975); Hawaiian Telephone Co. v. Hawaii, 405 F.Supp. 275, 90 L.R.R.M. 2854 (D.Haw.1975); Delaware Coach Co. v. Public Service Comm'n, 265 F.Supp. 648 (D.Del.1967); Allied Industrial Workers v. Schmidt, 43 L.R.R.M. 2808 (E.D.Ky.1959); Grand Rapids City Coach Lines v. Howlett, 137 F.Supp. 667, 37 L.R.R.M. 2259 (W.D.Mich.1955).
 
 V.
 
 64
 Accordingly, I would reverse the judgment of the district court and remand the proceedings.
 
 
 65
 Judge Hunter joins in this opinion, except to the extent it discusses injunctive relief. Since the court is reviewing the grant of a motion to dismiss for failure to state a claim on which relief could be granted, F.R.Civ.P. 12(b)(6), since the presence of at least one equitable remedy declaratory judgment is clear, he would allow the district court to provide for the making of an appropriate record. In this posture and at this procedural stage, he would not reach the various ramifications of, and problems involved in, injunctive relief.
 
 
 66
 ADAMS, Circuit Judge, dissenting.
 
 
 67
 I respectfully dissent, for I believe that the complaint does state a cause of action as to which relief may be granted. At the same time, however, I would not scrutinize the conduct of the New Jersey officials on the basis of the open-ended standard formulated by Judge Aldisert. Thus I am impelled to set forth separately my view that plaintiffs have advanced certain factual allegations that are sufficient to survive the defendants' motion to dismiss.[1]
 
 A.
 
 68
 Plaintiffs, fifteen local unions of the Amalgamated Transit Union, charged that New Jersey officials have violated the National Labor Relations Act (hereinafter NLRA) by interfering with collective bargaining between themselves and a number of transit companies. This alleged violation occurred when state officials, including the Governor, the New Jersey Commissioner of Transportation and the Governor's Counsel, proclaimed that the state would no longer subsidize any troubled transit companies that agreed to include an "uncapped" cost of living clause in their collective bargaining contracts or to grant wage increases higher than those extended to state employees.[2] In particular, New Jersey officials announced to the unions that the state "objected to the cost of living principle as it existed in current contracts and was going to 'destroy' it."[3]
 
 
 69
 The present action is grounded on the proposition that the warnings issued by the state officials, which under the circumstances severely limit the collective bargaining process insofar as provisions dealing with wages and cost of living increases are concerned, are at variance with federal labor law, and are therefore precluded under the Supremacy Clause.[4]
 
 
 70
 All parties to this dispute would appear to concede that the doctrine of preemption provides an appropriate framework for the analysis of the unions' claims set forth here. Yet it is necessary to clarify the sense in which the preemption rationale applies to this particular case, for it does not present a classic preemption situation. In the classic preemption prototype, there is a federal statute that comprehensively regulates an area of conduct and there is a state statute or regulation that is said to violate the federal law.[5] The state action sought to be proscribed here, however, is narrower in scope and of a different form than in the usual preemption context.
 
 
 71
 Nonetheless, the preemption cases cited by the majority provide a helpful analytical structure because they elaborate the general theory that undergirds federal preclusion of state conduct. The preemption decisions articulate the principle that state action may be held violative of federal law not only when the Congressional intent to preclude state action is " 'clear and manifest,' "[6] but also when the state action stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[7] Thus, if the state action alleged here contravenes the fundamental aims of Congress in enacting the NLRA, then the conduct may be found to violate that statute and to be foreclosed by it, even if such act is not in the form of the presence of a statute or regulation. This is so because the rationale of preemption would not appear to require the presence of a statute or regulation in order to be applicable, for the basic concern is with impinging upon the intent of Congress and undermining the federal statutory scheme.
 
 
 72
 In this case, then, the principal question is whether, viewing the complaint in the light most favorable to the plaintiffs, the warnings and other conduct of the state officials may be found to thwart the realization of any significant portion of the purposes and objectives of Congress as articulated in the NLRA.
 
 B.
 
 73
 One of the central aims of the NLRA is to guarantee that the process of collective bargaining will be governed by "the free play of economic forces."[8] The legislation was designed to afford private parties the opportunity to reach their own agreement regarding the terms and conditions of employment and to settle upon "an acceptable common ground"[9] without dictation by the government.[10] As the Supreme Court stated in H. K. Porter Co., Inc. v. NLRB,[11] the "fundamental premise" of the NLRA was one of "private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract."
 
 
 74
 In order to establish that the basic statutory purpose of the NLRA, namely, to supervise the procedure but not to interfere with the substance of collective bargaining, was undermined by the conduct of the New Jersey officials, plaintiffs must demonstrate first, that the action complained of is governmental conduct and not merely private behavior,[12] and second, that the primary aim of the NLRA in fact has been frustrated.
 
 
 75
 Surely, as stated, the conduct of the New Jersey officials cannot plausibly be construed, at least at this stage of the proceedings, as essentially non-governmental behavior. Perhaps it may be argued that, in a purely economic sense, New Jersey's power with respect to the transit companies is similar to that of a private purchaser of a significant quantity of transportation service. Nevertheless, in the present situation New Jersey was not merely threatening to bring some economic pressure to bear on the companies, as the majority suggests at p. 1029, but rather was warning that it would take definitive action which inevitably would lead to the financial ruin of the companies. This is so since a fair reading of the complaint discloses that the companies were able to survive only because of the state subsidies.[13] Moreover, under the applicable statutory provisions, it would appear that the state government has additional power to take direct action against the transportation companies, while a private purchaser is restricted primarily to the economic impact it may have on the contracting companies.[14] Thus, when the state officials conveyed their warnings to the unions and to the management negotiators, it must be assumed at this stage of the litigation that such officials operated in their capacity as representatives of government and not as private actors.
 
 
 76
 In considering whether the NLRA's fundamental purpose of protecting private collective bargaining has been encroached upon, it is necessary to determine whether the warnings and conduct of the state administrators constitute an attempt by the government impermissibly to dictate substantive terms of the parties' agreement.[15] The majority states at p. 1027 of its opinion, ". . . in the present case New Jersey has not directly commanded or prohibited the conduct of third parties but has merely sought to influence private conduct by threatening to withhold discretionary subsidies." However, at a minimum one declaration was made by the officials which as a practical matter is tantamount to a prohibition of certain terms in the collective bargaining agreement, namely, that the state would "destroy" a cost of living clause in the employment contract. This warning, which clearly goes beyond a general pronouncement of governmental policy, focuses immediately upon a crucial issue in the labor-management negotiations between the unions and the companies. When considering this charge in light of the defendant's motion to dismiss, it is necessary, under the rules governing such motions, to draw the inference that the parties may have interpreted the admonition as a ban on critical clauses in the labor contract.[16]
 
 
 77
 In evaluating the union's position, it is crucial to keep in mind the distinction between a particularized threat of drastic action, on the one hand, and a generalized policy statement regarding a program that the officials are responsible for superintending, on the other hand. When the unions claim that a threat has been made, they complain that the state officials in effect have sought to dictate specific terms of the collective bargaining agreement. Such an assertion is buttressed here by the strength of the denunciatory language, which threatens not just to oppose but rather to "destroy" a contractual clause. On the basis of this averment, the case should be remanded for further proceedings in which the validity of the unions' charge may be properly and fully ascertained.[17]
 
 C.
 
 78
 Although I would reverse the dismissal of the complaint and remand the case for a hearing, I am unable to accept the position advanced by Judge Aldisert that an attempt by New Jersey officials merely to alter the economic forces at work in the collective bargaining process or to influence the parties by itself violates the NLRA.[18] In the context of an industry heavily subsidized by the state, a large number of statements of governmental policy could alter in some sense the economic forces or influence the terms which negotiating parties may reach. To establish a violation of the NLRA, however, the unions would first have to allege and then demonstrate that the state officials attempted to dictate specific terms of the collective bargaining agreement, such as by seeking squarely to prohibit the parties' acceptance of an "uncapped" cost of living clause or wage increases greater than those granted to state employees.
 
 
 79
 To do anything further would be to expand the rationale present in preemption cases beyond its logical reach.[19] Further, and quite significantly, narrowing the scope of state conduct that is foreclosed by the NLRA to activity by state officials designed to dictate substantive terms in labor contracts is compelled by a due regard for first amendment interests.[20]
 
 
 80
 The state administrators here are charged with having expressed themselves in a manner violative of the NLRA. The first amendment's protection of expression traditionally has been of overriding significance in safeguarding public speech about political issues of great concern to citizens, and the matters involved in this case certainly fit within such a category.[21] Because of the importance of the first amendment and the emphasis on permitting officials to speak fully about public issues, courts have been cautious in restricting the scope of such expression, and only exceedingly narrow exceptions have been crafted to apply to comments amounting to violations of law, such as those referred to in Section B of this opinion.[22]
 
 
 81
 An analogous situation to that arising in this case occurs when an employer makes statements to his employees in an attempt to discourage them from joining a union. The Supreme Court in NLRB v. Gissell Packing Co., Inc.,[23] indicated that an employer has a broad first amendment right to express himself that is consistent with the equal right of the employees to state their views. However, the employer may not make statements that contain a " 'threat of reprisal or force or promise of benefit,' "; and the Court in Gissell proceeded to add:
 
 
 82
 "If there is any implication that an employer may or may not take action solely on his own initiative . . . the statement is no longer a reasonable prediction based on available facts but a threat of retaliation . . . and as such without the protection of the First Amendment."[24]
 
 
 83
 Apart from the narrowly circumscribed restriction pertaining to threats, the employer would appear to be entitled under Gissell, in the exercise of his first amendment rights, to express his views about unions in general or about the particular union organizing in his plant.[25] Similarly, here, the state officials cannot be prevented from making general policy declarations, but may be restricted only from making statements in the nature of specific threats directed at the parties to labor negotiations.[26]
 
 
 84
 In sum, given the threat by state officials to ban or destroy critical clauses of a collective bargaining agreement, the complaint here should not be dismissed. But because I believe that it is essentially these specific threats that rise to the level of a violation of federal law, not the announcements expressing a generalized policy position, I cannot subscribe to an interpretation of the NLRA which would impose a blanket prohibition of declarations by state officials criticizing cost of living or similar provisions in a labor contract.
 
 
 
 [1]
 Contract disputes have been resolved at two of the struck companies. The complaint asserts that the strikes against two other companies are continuing, and that "negotiations are about to begin (at other companies) in light of the imminent expiration dates of their (collective bargaining) contracts."
 
 
 [2]
 Even putting aside the difference between state law which establishes mandatory regulation of private conduct and New Jersey's action in this case, the State's threat not to subsidize transportation companies which agree to unlimited cost of living increases does not infringe upon the primary jurisdiction of the NLRB because it does not, even arguably, constitute an interference with rights guaranteed under § 7 of the NLRA, or regulate activities which are unfair labor practices under § 8. See San Diego Unions v. Garmon, 359 U.S. 236 at 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). But even if it could be argued that the State had invaded § 7 rights or regulated activities which are an unfair labor practice, the analysis set forth in the text below would be appropriate, due to the difference between direct mandatory regulation, and a threat to discontinue subsidies
 
 
 [3]
 DeCanas v. Bica, 424 U.S. 351, 357-8, at n.5, 96 S.Ct. 933, 937, 47 L.Ed.2d 43, states that:
 Of course, even absent such a manifestation of congressional intent to "occupy the field," the Supremacy Clause requires the invalidation of any state legislation that burdens or conflicts in any manner with any federal laws or treaties . . . However, "conflicting law absent repealing or exclusivity provisions, should be pre-empted . . . 'only to the extent necessary to protect the achievement of the aims of' " the federal law, since "the proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding (the state scheme) completely ousted.' " Merrill Lynch, Pierce, Fenner & Smith v. Ware, 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973), quoting Silver v. New York Stock Exchange, 373 U.S. 341, 361, 357, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).
 
 
 [4]
 In the context of a state subsidy plan for the benefit of private entities, it has been held that such subsidies do not necessarily constitute a burden on interstate commerce. Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)
 
 
 [5]
 We also need not reach a second constitutional question: the extent if any, to which the First Amendment might protect states and state officials when they threaten to terminate payments to companies which agree to uncapped cost of living increases. See 29 U.S.C. § 158(c); NLRB v. Gissel Packing Co., 395 U.S. 575, 616-20, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)
 
 
 [1]
 The complaint also averred that two of the strikes ended with the signing of contracts which did not include the cost of living clause; that two of the strikes continued; and that negotiations were about to begin between the union locals and other transit companies
 
 
 [2]
 In the context of Roscoe Pound's formulation, the majority and I part company in the first step of the decisional process:
 Supposing the facts to have been ascertained, decision of a controversy according to law involves (1) selection of the legal material on which to ground the decision, or as we commonly say, finding the law; (2) development of the grounds of decision from the material selected, or interpretation in the stricter sense of that term; (3) application of the abstract grounds of decision to the facts of the case. The first may consist merely in laying hold of a prescribed text of code or statute, or of a definite, prescribed, traditional rule; in which case it remains only to determine the meaning of the legal precept, with reference to the state of facts in hand, and to apply it to those facts.
 Pound, The Theory of Judicial Decision, 36 Harv.L.Rev. 940, 945-46 (1923).
 
 
 [3]
 Prior to the Act's passage, the Senate Committee on Education and Labor stated:
 The committee wishes to dispel any possible false impression that this bill is designed to compel the making of agreements or to permit governmental supervision of their terms. It must be stressed that the duty to bargain collectively does not carry with it the duty to reach an agreement, because the essence of collective bargaining is that either party shall be free to decide whether proposals made to it are satisfactory.
 S.Rep.No. 573, 74th Cong., 1st Sess. 12 (1935).
 
 
 [4]
 Nothing I say here should be construed as contrary to the salutary state programs which provide state mediation services upon application by negotiating parties. Such programs have as their purpose the encouragement. not coercion, of satisfactory agreement on working conditions. See, e. g., Pa.Stat.Ann. tit. 43, §§ 211.31-.39
 
 
 [5]
 Private transit companies receive state aid under the following provision:
 The Department of Transportation is hereby authorized to contract with any motor bus carrier operating bus or rail transit service in the State which is in imminent danger of terminating all bus services or all rail transit services provided by said motor bus companies to insure the continuance of that portion of the bus and rail transit services which is essential. Payment by the department under such a contract shall not exceed the actual cost to the motor bus carrier for providing such services and shall not include any return on investment.
 
 
 [27]
 N.J.Stat.Ann. § 1 A-28.1 (Supp.1976)
 
 
 [6]
 An examination of the congressional debates and legislative history of the Norris-LaGuardia Act leads to the inescapable conclusion that the Act was intended to curb the abuse of the injunction and the powerful threat of contempt in labor disputes. Numerous examples of sweeping injunctions directed against workers, union members and officials, and those who might offer them aid were cited in the debates. The problem was summarized by Representative O'Connor:
 Among the many abuses of the issuance of injunctions in labor disputes has been forbidding the unions to pay any strike benefits to the strikers; forbidding any person, whether a member of the union or not, to give any aid or assistance to the strikers. Often the injunctions have gone so far as to forbid attorneys to advise the strikers as to their rights even in proceedings to dispossess the strikers from their homes. Again some injunctions have prohibited the strikers from giving any publicity to the existence of the strike or the reasons for it or their justification of it. Such prohibitions are, of course, outrageous violations of the right of "free speech."
 Yet there has been no legislative law for these extraordinary decrees of our courts. This judge-made law has developed in the past 40 years. The judges have themselves made the law and have themselves enforced the penalties for the violation of the laws made by them.
 
 
 [75]
 Cong.Rec. 5463 (1932) (remarks of Representative O'Connor); see, e. g., id. at 4620-21, 4624, 4625
 The nature of the contempt power and in particular, the fact that it could be unilaterally imposed by the same judge who issued the injunction claimed to have been violated, was of serious concern to the legislators. Thus, Senator Norris stated:
 And let us suppose, too, that for a violation of this order, one of the defendants was arrested. Where would he be tried? Would it be in the courts of the State where the offense is alleged to have been committed? No. . . . (discussing contempt) . . .. In such a case the defendant would have committed a crime as defined by this arbitrary law in the shape of an injunction not a crime under the State law, not a crime under any Federal law, but a crime made so by an arbitrary order of a judge . . .. And if, when he was arrested, there was a dispute as to whether he had violated the order of the judge and thus committed a crime, would he have the right to lay his case before a jury of his peers? Would the constitution and laws of the State where the alleged offense was committed control in such trial? No. No jury could sit in that case. Who would be the jury? The answer is, the judge the same person who made the law, the same person who fixes the penalty. He would fix the punishment and he would render the judgment, and at his will the defendant would go to jail for a time limited only by the discretion of the same judge.
 Id. at 4507 (remarks of Senator Norris).
 The legislators' basic concern was that the contempt power altered the relative positions of labor and management to the point that concerted action by labor could only be undertaken under threat of imprisonment. See id. at 4625.
 
 
 [7]
 Senator Norris: "(L)aboring men have organized into associations and unions in order that they may present a united front to the demands of combined wealth and great aggregations of capital. His right to do this has become universally recognized, but, (misuses of injunctive power) have often taken away the real right of labor to have a voice in the wage it shall receive, and the effect has often been involuntary servitude on the part of those who must toil in order that they and their families may live." 75 Cong.Rec. 4502 (1932)
 Representative LaGuardia: "Gentlemen, this bill does not and I can not repeat it too many times this bill does not prevent the court from restraining any unlawful act. This bill does prevent the Federal court from being used as an agency for strike-breaking purposes . . . to break a lawful strike. This is what the bill does.
 "The bill does not take one iota of jurisdiction because we have not the power from the State courts and does not change any State law.
 "Therefore you can well disregard all these expressions of fear of destroying the Government. Gentlemen, there is one reason why this legislation is before Congress and that one reason is disobedience of the law on the part of whom? On the part of organized labor? No. . . . (discussion of injunctions against labor) . . . . The trouble is that a few and I am glad to say a few Federal judges . . . were willing to . . . take the employer side of a labor dispute, and act as a strike-breaking agency. That, gentlemen, is the reason, the history, and the necessity of my bill." 75 Cong.Rec. 5478 (1932).
 
 
 [1]
 As both Chief Judge Seitz and Judge Aldisert have noted, in reviewing a determination by a district court that plaintiffs have not stated a cause of action upon which relief may be predicated, the allegations in the complaint must be taken as true. In addition, all inferences must be drawn in favor of the plaintiffs, and dismissal may be affirmed only if it appears certain that no set of facts may be shown on which relief may be granted
 
 
 [2]
 New Jersey has been engaged in a program of subsidizing transportation companies in "imminent danger of terminating all bus services or all rail transit services" in order to guarantee the continuation of essential transportation throughout the state. See 27 N.J.Stat.Ann. § 1 A-28.7 (Supp.1977)
 
 
 [3]
 Plaintiffs alleged that on January 9, 1976, New Jersey's Commissioner of Transportation, Alan Sagner, called a meeting of the local union officials involved in contract negotiations with the transit companies and there announced that "the State would not continue its policy of subsidizing troubled private transit companies if the unions insisted on retaining the 'uncapped cost of living' clause in their contract. . . . " On February 6, 1976, Sagner and the Counsel to Governor Byrne, Lewis Kaden, met with union officials in Washington, D. C., and noted that the state objected to the cost of living clause in the existing contracts and would "destroy" it
 After the parties reached an impasse in their negotiations, a strike ensued during which Governor Byrne publicly declared, once again, that the state would not subsidize any transit company that had a cost of living clause in its labor contract. Also, Commissioner Sagner distributed to both sides in the controversy a written document announcing that if the labor contracts included salary and benefit increases above those awarded state employees, the state would terminate its subsidies to the affected companies.
 4 U.S.Const. Art. VI, § 2.
 
 
 [5]
 See, e. g., DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)
 
 
 [6]
 Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 146, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), quoting Rice v. Sante Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). See also National Association of Regulatory Utility Commissioners v. Coleman, 542 F.2d 11, 13-14 (3d Cir. 1976)
 
 
 [7]
 Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See DeCanas v. Bica, 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976) ("There remains the question whether, although the INA contemplates some room for state legislation, § 2805(a) (of the California Labor Code) is nevertheless unconstitutional because it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the INA. . . . We do not think that we can address that inquiry upon the record before us.")
 
 
 [8]
 NLRB v. Nash-Finch Co., 404 U.S. 138, 144, 92 S.Ct. 373, 377, 30 L.Ed.2d 328 (1971). See generally 29 U.S.C. § 151
 
 
 [9]
 1 NLRB Ann.Rep., pp. 85-86, quoted in NLRB v. Insurance Agents, 361 U.S. 477, 485, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960)
 
 
 [10]
 See H. K. Porter Co., Inc. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970), which holds that although the NLRB has power to require the employer and employee to negotiate, it does not have power to compel either party to agree to substantive contractual provisions. The Board had found that the company's refusal to bargain about the "check off" dues owed the union by its members was not in good faith. In refusing to approve this practice, the Court emphasized:
 The object of this Act was not to allow governmental regulation of the terms and conditions of employment, but rather to ensure that employers and their employees could work together to establish mutually satisfactory conditions . . . But it was recognized from the beginning that agreement might in some cases be impossible, and it was never intended that the Government would in such cases step in, become a party to the negotiations and impose its own views of a desirable settlement. (pp. 103-104, 90 S.Ct. p. 823.)
 See also Lodge 76, International Association of Machinists and Aerospace Workers, AFL-CIO v. Wisconsin Employment Relations Commission, 427 U.S. 132, 149-50, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976), and NLRB v. Insurance Agents, 361 U.S. 477, 490, 80 S.Ct. 419, 428, 4 L.Ed.2d 454 (1960), where the Court stated: "Our labor policy is not presently erected on a foundation of government control of the results of negotiations."
 
 
 [11]
 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970)
 
 
 [12]
 As the majority has pointed out, the NLRA interdicts the activities of private parties only if they are employers or labor organizations or the agents of either, and its definition of "employer" specifically excludes "any State or political subdivision thereof" acting in the capacity of employer. 29 U.S.C. § 152 (Supp.1977). See Judge Seitz' opinion at p. 1029
 The suggestion has also been made that New Jersey's role in this case is similar to that of an employer, and as such New Jersey is exempt from the NLRA. Inasmuch as facts supporting this latter view are not in the record before us, however, we are not able to address that important issue.
 
 
 [13]
 The program of subsidies was specifically designed only for companies in "imminent danger" of terminating services. See 27 N.J.Stat.Ann. § 1 A-28.7 (Supp.1977)
 
 
 [14]
 The "purpose and intent" of New Jersey's Transportation Act is "to establish the means whereby the full resources of the State can be used and applied" in order "to solve or assist in the solution of the problems of all modes of transportation." 27 N.J.Stat.Ann. § 1 A-1. The agency has power to "(i)nvestigate any matters concerning any carrier under contract to the agency and in aid of such investigation . . . The carrier shall make available its property, books, records, or documents." 27 N.J.Stat. Ann. § 1 A-25(b). Moreover, the agency may ". . . do and perform any and all acts or things necessary, convenient or desirable for the purposes of the agency or to carry out any power expressly given in this act." 27 N.J.Stat.Ann. § 1 A-25(h)
 
 
 [15]
 As the majority concedes at p. 1028 of its opinion: "It cannot be doubted that New Jersey would be barred under the Supremacy Clause from prohibiting private parties from agreeing to unlimited cost of living clauses in their collective bargaining agreements."
 
 
 [16]
 The prohibition of such a threat would not frustrate the state's power to operate its Transit Subsidy Program so as to guarantee essential transportation services in New Jersey. Because the curbing of this warning would be a relatively narrow prohibition, it would not affect the state's fundamental power to establish policy regarding the subsidization of the transportation industry. A basic attribute of state sovereignty, or a function essential to a state's separate and independent existence, is thus not at stake here. Cf. National League of Cities v. Usery, 426 U.S. 833, 847-52, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)
 
 
 [17]
 In light of the fact that the majority does not address the question whether the Norris-LaGuardia Act precludes a district court from granting relief in this case, no purpose would be served by my discussing that Act at this point, especially given Judge Aldisert's separate treatment of its application to this controversy
 
 
 [18]
 At page 1034 of his opinion, Judge Aldisert states: "What is beyond the pale of permissible action is official activity that seeks to alter the economic forces at work or to influence the substantive terms of collective bargaining agreements."
 
 
 [19]
 The Supreme Court has made it clear that preemption of state action is appropriate only when the nature of the regulated subject matter permits no other conclusion or when Congress has unmistakably so ordained. See Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963). It has not been demonstrated in this case, at least thus far, that policy statements alone, in the absence of threats, fall within these categories or that they prevent the full accomplishment and execution of the purposes of Congress. See Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Both Florida Lime and Hines are cited with approval in DeCanas v. Bica, 424 U.S. 351, 356, 364, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)
 
 
 [20]
 It is important to bear in mind that where various constructions of a statute are possible, the judicial branch is admonished to adopt the one that avoids raising problems of constitutional dimensions. Cf. Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936), quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932), where Justice Brandeis, in a concurring opinion, reaffirmed the rule that "(w)hen the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."
 
 
 [21]
 See e. g., Bond v. Floyd, 385 U.S. 116, 135-36, 87 S.Ct. 339, 349, 17 L.Ed.2d 235 (1966): "The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment . . . is that 'debate on public issues should be uninhibited, robust, and wide-open.' " The view, embraced by the Court in Bond, that legislators have "an obligation to take positions on controversial political questions so that their constituents can be fully informed . . . ." id., applies equally to executive officials such as are involved in this case. See also Elrod v. Burns, 427 U.S. 347, 356-57, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)
 
 
 [22]
 The Supreme Court has held from time to time that certain forms of speech are outside the protection of the first amendment, and that general regulatory statutes not intended to control the content of speech, but incidentally limiting its unfettered exercise, are permissible when they have been found justified by valid governmental interests. NAACP v. Button, 371 U.S. 415, 453, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (Harlan, J., dissenting); Konigsberg v. State Board, 366 U.S. 36, 50-51, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Cox v. New Hampshire, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)
 See also, Teamsters Union v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949).
 
 
 [23]
 395 U.S. 575, 617-18, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)
 
 
 [24]
 395 U.S. at 618, 89 S.Ct. at 1942
 
 
 [25]
 See also, Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council Inc., 425 U.S. 748, 762 and 763 n.17, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)
 
 
 [26]
 Because the parties did not brief the first amendment issue in this case, it would not seem advisable, at least at this time, to consider it in further depth. Cf. U. S. v. O'Brien, 391 U.S. 367, 390, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (Douglas, J., dissenting)