MASSACHUSETTS NURSES ASSOCIATION, Plaintiff,

v.

Michael S. DUKAKIS et al., Defendants.

Civ. A. No. 83–386–G.

United States District Court, D. Massachusetts.

Sept. 9, 1983.

---

Alan J. McDonald, McDonald & Noonan, Boston, Mass., for plaintiff.

William Pardee, Asst. Atty. Gen., Boston, Mass., for defendants.

### MEMORANDUM AND ORDER OF DISMISSAL

GARRITY, District Judge.

The plaintiff, the Massachusetts Nurses Association (hereinafter the "MNA"), is a professional organization incorporated under Massachusetts law for the purpose of advancing the profession of registered nursing. The MNA filed this complaint February 14, 1983, naming Governor Michael S. Dukakis and three Commissioners of the Massachusetts Rate Setting Commission as defendants, and seeking declaratory and injunctive relief. The complaint seeks a declaration that Massachusetts General Laws Chapter 6A, Sections 31 *et seq.,* which establish a prospective reimbursement system for Massachusetts hospital costs, is preempted by the Labor Management Relations Act pursuant to the supremacy clause of Article VI of the United States Constitution. The plaintiff contends that the prospective reimbursement system established by the Massachusetts law substantially interferes with the Labor Management Relations Act and is therefore preempted. The plaintiff seeks preliminary and permanent injunctive relief against application and enforcement of the Massachusetts statute.

The defendants' motions to dismiss are presently before the court. The motions were filed March 8, 1983, the court received memoranda of law from the parties, and the court heard oral argument on June 2, 1983.

### Legislative Background

The statute at issue is Massachusetts' new hospital payment law, which became effective October 1, 1982. The MNA contends that the statute gives the Massachu-

setts Hospital Association and its member hospitals a distinct and significant advantage over the MNA in collective bargaining and therefore the law interferes with the operation of the Labor Management Relations Act. The MNA contends that the Massachusetts Hospital Association ("MHA") had an integral role in the drafting and lobbying for passage of the law, and the law has interfered with collective bargaining between registered nurses and hospitals throughout the Commonwealth of Massachusetts by causing prolonged negotiations and decreased levels of pay increases for nurses.

The statute is the latest in a series of statutes which have increased the role of the state in regulating hospital costs and charges. The state regulatory scheme has been developing since 1965. In that year, the United States Congress created the Medicare and Medicaid programs (Titles XVIII and XIX of the Social Security Act, now found at 42 U.S.C. §§ 1395–1395xx and 42 U.S.C. §§ 1396–1396p, respectively) in an effort to expand the availability of health care benefits nationwide. Under these programs, hospitals and other providers of health care services were reimbursed for their costs of providing health care to the millions of patients who qualified for Medicare or Medicaid. As originally formulated, these programs virtually guaranteed that all costs incurred by providers would be reimbursed, thus encouraging hospitals and other providers of health care services to participate in the programs. Medicare and Medicaid proved to be very successful in increasing the availability of health care services in this country. However, along with the increased government-financed demand and increased availability of health care came increased costs. *See* C. Schramm, A State-Based Approach to Hospital-Cost Containment, 18 Harv.J. on Legis. 603, 604 & 604 n. 3 (1981) and articles cited therein. The Medicare and Medicaid programs required the reimbursement on the basis of the hospitals' "reasonable costs" to hospitals which provided inpatient services. Originally, when these programs were first implemented, "reasonable costs" and

actual costs were not significantly different. There were administrative mechanisms for preventing overcharges, but under Medicare virtually all hospital costs which fell into specified categories were reimbursed. When the Medicaid Act was enacted, Pub.L. No. 89–97, §§ 1901–1905, 79 Stat. 343 (1965), the Secretary of HEW and the courts interpreted the Act to require the states, which are primarily responsible for administering Medicaid, to reimburse hospitals in a manner similar to the allowable cost method under the Medicare Act, i.e., reimbursement for the costs actually incurred by the hospitals. *See Massachusetts General Hospital v. Weiner,* 1 Cir. 1978, 569 F.2d 1156, 1158; *Massachusetts General Hospital v. Sargent,* D.Mass.1975, 397 F.Supp. 1056, 1062 & 1062 n. 5; *Catholic Medical Center of Brooklyn and Queens, Inc. v. Rockefeller,* E.D.N.Y.1969, 305 F.Supp. 1256; *Connecticut State Department of Public Welfare v. Department of Health, Education and Welfare,* 2 Cir.1971, 448 F.2d 209. The existence of these programs provided significant incentives for hospital expansions and other increases in hospital costs which were then passed through to taxpayers through Medicare and Medicaid reimbursement. As hospital costs rose rapidly, public pressure was put on Congress and the Department of Health, Education and Welfare to limit Medicaid expenditures and the Secretary changed his position in 1971. *See* 45 C.F.R. § 250.30. In 1972, Congress amended the Medicaid statute to allow states to deviate from the reasonable cost approach employed under Medicare. In order for a state to participate in Medicaid, it must submit a plan to the Secretary of HEW (now Health and Human Services) which details how the state will fulfill the requirements of the Medicaid statute. *See* 42 U.S.C. § 1396 *et seq.* The 1972 statutory amendments provide that states can submit reimbursement plans which do not use the same "costs actually incurred" approach that is employed in the Medicare program. Alternative plans must be designed to encourage efficiency and economy, must provide for

payment of the reasonable cost for such services, and must not produce reimbursement which exceeds that which would result if the Medicare "costs actually incurred" approach were employed. *See* 42 U.S.C. §§ 1395b–1 and 1396a *et seq.* The motivation behind the Amendments' encouragement of experimental departures from reimbursement along a "costs actually accrued" approach was a growing national concern about the rate at which hospital costs were rising. *See, e.g.,* Note, Hospital Cost Control: Single-Edged Initiatives for a Two-Sided Problem, 15 Harv.J. on Legis. 603, 604 (1978) ("hospital expenditures rose from $3.7 billion in 1950 to $55.4 billion in 1976, and if left unchecked, they are expected to surpass $100 billion by 1982.")

Massachusetts submitted a plan for prospective reimbursement of Medicaid and it was approved by the Secretary of HEW in 1973. The plan was implemented in 1974. *See Massachusetts Hospital Assoc. v. Harris,* D.Mass.1980, 500 F.Supp. 1270, 1274–1275; *Massachusetts General Hospital v. Weiner, supra* at 1158–1159. Since that time, Massachusetts' Medicaid reimbursement scheme has been much different than the federal Medicare reimbursement scheme, but all changes have been approved by the Secretary of HEW or the Secretary of the successor Health and Human Services ("HHS").

Since 1974, the Massachusetts plans have always involved, at least to some extent, prospective reimbursement. Prospective reimbursement had been considered explicitly by the Congress during the hearings which predated the 1972 legislation which allowed and encouraged experimentation by the states:

> [The House Ways and Means Committee] believes that payment determined on a prospective basis offers the promise of encouraging institutional policy makers and managers, through positive financial incentives, as well as the risk of possible loss inherent in that method, to plan, innovate, and generally to manage effectively in order to achieve greater financial reward for the provider as well as a lower total cost to the program involved. . . . Theoretically, this approach to reimbursement introduces incentives not present under the existing reimbursement method which, since it tends to pay whatever the costs turn out to be, provides no incentives for efficiency.

H.R.Rep. No. 92–231, 92d Cong., 1st Sess. 80 (1971), quoted in S.M. Weiner, "Reasonable Cost" Reimbursement for Inpatient Hospital Services Under Medicare and Medicaid: The Emergence of Public Control, 3 Am. J.L. & Med. 1, 30–31 (1977). Massachusetts General Hospital ("MGH") challenged the Massachusetts plan, contending that it was not consistent with the Medicaid statutory scheme. *See Massachusetts General Hospital v. Weiner, supra. See also Affiliated Hospitals Center Inc. v. Rate Setting Commission,* 1979, 7 Mass.App.Ct. 563, 572–577, 389 N.E.2d 744. The basis of the challenge was the hospital's contention that Massachusetts' plan reimbursed the hospital prospectively and operated on the erroneous assumption that the hospital's average daily costs for providing health care to a Medicaid patient would be the same as the average daily costs for non-Medicaid patients. This assumption led the Massachusetts Rate Setting Commission to set a reimbursement rate for hospital treatment of Medicaid inpatients on the basis of the average cost per day of treating all the patients in the hospital. MGH contended that this plan failed to reimburse the hospital for its "reasonable costs" under the Medicaid program. The Court of Appeals rejected the hospital's challenge, noting that the Secretary of HEW had approved the plan, the plan was formulated with the "valid goal of providing incentives for efficiency and economy," and the plan did not have to be perfect to be lawful so long as it was consistent with the requirements of the federal statutory scheme. *Id.* at 1158, 1159. The prospective reimbursement scheme was upheld against all statutory and constitutional challenges.

The effect of Massachusetts' prospective reimbursement of Medicaid costs was to put pressure on hospitals to cut costs and be efficient. However, despite federal regulations to the contrary, see 20 C.F.R.

§§ 402(b)(3) and 405, the costs of providing health care to Medicaid patients were shifted to private patients and third-party payors. *See, e.g.*, P. Caper & D. Blumenthal, Special Report: What Price Cost Control? (Massachusetts' New Hospital Payment Law), 308 N.E.J. of Med. 542 (1983). In addition, many perceived that a disproportionate share of the costs of providing free care and covering bad debts was passed on to insurers and self-paying patients. *Id.* at 543. This resulted in rapidly spiraling health care costs to non-Medicaid patients and to employers who paid private insurers to provide health care for their employees. Cf. *New England Medical Center, Inc. v. Rate Setting Commission*, 384 Mass. 46, 1981 Mass.Adv.Sh. 1589, 1594 n. 4, 423 N.E.2d 786 ("The hospitals' charges to the general public generally exceed reasonable costs, as those costs are computed by the commission"). *See also* Caper & Blumenthal article, *supra;* Weiner article, *supra.* The law at issue in the instant proceedings is the result of an effort by the Massachusetts legislature to contain health care costs and to eliminate the perceived unfairness in the allocation of hospital costs among Medicaid and Medicare patients, Massachusetts Blue Cross, commercial insurers, and self-paying patients.

### The Massachusetts Statute

In 1981, the MHA and Massachusetts Blue Cross (hereinafter "Blue Cross") signed an agreement which set for each MHA hospital a formula for computing a prospective "maximum allowable cost," which represented the total annual payment Blue Cross would make to that hospital in the upcoming year. *See* Blue Cross of Massachusetts Hospital Agreement 29 Section I.U. at 29 (October 1, 1981) (hereinafter referred to as "HA–29"). That agreement was approved by the Massachusetts Rate Setting Commission. With Medicaid payments limited by Massachusetts' pro-

spective reimbursement system as approved by the Secretary of HHS and payments by Blue Cross limited by the prospective reimbursement system outlined in HA–29, hospitals were expected to pass all additional costs on to commercial insurers and self-paying patients. Because of that concern, the Massachusetts legislature passed the statute the MNA is here challenging. The legislation at issue uses HA–29 as a model, but, in effect, increases the scope of the agreement, because as incorporated into the legislation, it now governs the payments to hospitals from all classes of patients, including the Medicaid payments, payments from Blue Cross and commercial insurers, and payments from private, self-paying patients. The legislation incorporates the analysis and even specific portions of HA–29 as the means by which the Massachusetts Rate Setting Commission must make an annual determination of the amount which will be paid to each Massachusetts hospital. The legislation is an attempt to establish a common level of charges for hospital services independent of whether the patient's bill will ultimately be paid by Medicaid or Blue Cross or by the patient himself. *See* Mass.Gen.L. c. 6A, § 53, as amended August 10, 1982 ("The commission shall require that charges for health care services rendered in each acute hospital shall be uniform for all patients receiving comparable services.") Because the legislation establishes the state's plan for reimbursement under the Medicaid program, implementation of the new law was made contingent on the Secretary of HHS approving it, as required by the federal laws governing Medicaid. That approval was granted, and the law became effective on October 1, 1982.

The challenged statute, like HA–29, operates by computing a "maximum allowable cost." The statute sets the fiscal year 1981 as a base period and uses hospitals' reimbursable costs for that period [1] as the "max-

---

1. The Fiscal 1981 reimbursable costs are adjusted to some extent to take account of the fact that certain expenses were not incurred throughout 1981, but were only incurred for part of the year. These costs are annualized, or projected as if they were incurred all year long, in the calculation of the 1981 "maximum allowable cost." *See* HA–29, *supra,* Article IV. A.4.a.i. at 29.

imum allowable costs" for 1981, a reference point for computing hospitals' reimbursable costs for all future years. The 1981 "maximum allowable cost" figure ("MAC") is then adjusted by a formula that is set forth in Article IV of HA–29. The formula divides the costs that make up the 1981 MAC into several categories, and adjusts each individual component of hospital cost by reference to an individually determined inflation factor for that year. Different inflation factors are applied to each category of costs.

The statute sets the inflation factors by reference to the formula set out in HA–29, which in turn refers to the "Commission/Harbridge House methodology of 79 cost categories." HA–29, *supra,* Article IV. A.4.b.i. at 32. Appendix J of HA–29 lists the categories and explains how the inflation adjustment factor for each category is computed. For example, to compute the adjustment for registered nurses, the aggregate percentage change in the average annual salaries of chemists, engineers and accountants are considered. The data is obtained from the Bureau of Labor Statistics and the National Survey of Professional, Administrative, Technical, and Clerical Pay. *See* HA–29, *supra,* Appendix J, Cost Categories, Economic Change Indicators and Explanatory Variables for Forecasting § .03 at 203.

The statute, incorporating the HA–29 approach, takes the 1981 base year costs, adjusts the costs in the respective categories by the inflation factor applicable to that category, then adjusts for other costs, such as wage parity costs,[2] and factors them into the calculation. These costs are then added up and the total, or global figure, consti-

tutes the MAC for fiscal 1982, the amount that the hospital will be able to collect for the care provided to all of its patients during 1982, regardless of the source of payment. The MAC for fiscal 1982 is, in turn, adjusted under this formula and, as adjusted, it yields the MAC for fiscal 1983. The statute, however, incorporates an additional cost-cutting feature. The statute provides that the revenue approved for each hospital shall be reduced annually by a "productivity factor."[3] These "productivity factors" were included to force a gradual overall improvement in hospitals' efficiency and economy.

The motion presently before the court is the defendants' motion to dismiss the complaint for failure to state a claim. Therefore, we shall consider for the purpose of this motion only the facts and allegations set forth in plaintiff's complaint and we shall assume they are true. *See Conley v. Gibson,* 1957, 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80; *Harper v. Cserr,* 1 Cir. 1976, 544 F.2d 1121, 1122.

*Standing*

The first, threshold issue, is whether the plaintiff has standing to bring this case before the court. In our view, the plaintiff does have standing. The MNA alleges that the state of Massachusetts has interjected itself into the collective bargaining process between the MNA and the MHA after the lobbying efforts of the MHA proved successful, that this interjection has unfairly deprived the MNA of their opportunity to bargain freely for wage increases, and that the interjection interferes with national labor policy as expressed by the Congress in

---

**2.** Wage parity adjustments and other similar adjustments are intended to improve the validity of a base year figure as a number upon which to base future year estimates. Because certain costs do not rise smoothly, but rather make occasional significant increases, adjustments were made to bring costs into line with the Harbridge House figures for the period prior to 1982. For example, the base year figure for registered nurses was increased by an additional 15.78% because during the preceding three years actual costs of nurses' salaries had

not increased as fast as the statutory proxies. *See* HA–29, *supra,* Article IV.A.4.b.iii. at 32.

**3.** It is difficult to parse the complicated statutory provisions, but it appears that the statute requires that the productivity factors are 1.4% in fiscal 1983, 2% for fiscal 1985, 2% for fiscal 1986, 2% for fiscal 1987, and 1% for fiscal 1988. *But see* Caper & Blumenthal article, *supra,* at 542 (the statute "requires that the revenue approved for each hospital be reduced by 0.5 to 2 per cent each year for the next six years, to a total reduction of 7.5 percent.")

the Labor-Management Relations Act ("LMRA"), and as such is a violation of the Supremacy Clause of the Constitution. This is not a case where the plaintiff has attempted to assert the right of another before the court. The plaintiff alleges that the LMRA was passed to regulate the collective bargaining process and to give labor organizations the right to bargain freely without state interference. The MNA is a labor organization within the meaning of the Labor Management Relations Act. 29 U.S.C. § 152(5). If the plaintiff's interpretation of the LMRA is correct and this state statute constitutes an impermissible interference with the LMRA, the plaintiff has a clear right to prevent the injury here alleged. *See Munoz-Mendoza v. Pierce,* 1 Cir. 1983, 711 F.2d 421 at 425.

Therefore, the only standing question which remains is whether the plaintiffs have suffered "injury in fact," i.e., whether the exercise of the court's remedial powers in this case would redress the plaintiff's claimed injuries. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 1978, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595; *Simon v. Eastern Kentucky Welfare Rights Org.,* 1976, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450; *Munoz-Mendoza v. Pierce, supra,* 711 at 424, 425. This case is distinguishable from *National Union of Hospital and Health Care Employees v. Carey,* 2 Cir.1977, 557 F.2d 278, in which the United States Court of Appeals for the Second Circuit held that nursing home employees did not have standing to challenge the state of New York's interpretation of the Medicaid statute and a New York prospective Medicaid reimbursement plan that had been approved by the Secretary of HEW. In that case, while the plaintiffs may have satisfied the constitutional standing requirement that the parties should be sufficiently adverse to present the court with a justiciable "case or controversy," the majority held that the nursing home employees "would not be nearly as effective proponents of the rights of the nursing homes in these areas as would the homes themselves." Hence plaintiffs had not satisfied the "prudential" standing requirements to challenge the state and federal interpretations of the statute. *Id.* at 282. *See also Munoz-Mendoza v. Pierce, supra,* at 425. *But see National Union of Hospital and Health Care Employees v. Carey, supra,* at 283–288 (Mansfield, J., dissenting). However, the majority decision merely affirmed the district court decision that the plaintiffs did not have standing to challenge the interpretation of "reasonable costs" agreed upon by the state of New York and the Secretary of HEW. *See National Union of Hospital and Health Care Employees v. Carey,* S.D.N.Y.1976, 409 F.Supp. 1197, *aff'd,* 2 Cir.1977, 557 F.2d 278. The district court had reached the merits of the plaintiffs' claim that the state actions there at issue interfered with federal labor law and dismissed the complaint for failure to state a claim, not for a lack of standing. *Id.,* 409 F.Supp. at 1201 ("[I]f, under a provision of the LMRA, there is a right that may be enforced in this area against the state, the unions would have standing to raise such a right." It was that decision which was affirmed by the Second Circuit. *See National Union of Hospital and Health Care Employees v. Carey, supra,* 557 F.2d at 282. Similarly, we find that in this case the MNA has standing to press its claims that the state statute interferes with the MNA's rights under the LMRA to engage freely in collective bargaining. We now turn to the merits of those claims.

### Plaintiff's Complaint

The complaint filed by the MNA attacks the Massachusetts statute on the following grounds: 1) The MHA "played a significant role in the framing and lobbying for passage" of the law. 2) The level of rates set by the statute "is largely dependent upon the provisions of ... HA–29, which was negotiated between the MHA on behalf of the hospital industry and Blue Cross of Massachusetts, Inc.," so the criteria by which hospital rates and reimbursement are formulated and reviewed reflect the MHA's negotiating concerns and abilities. 3) The MHA is given a role under the Massachusetts law in recommending individuals to

serve on a "rate setting commission hospital policy review board" and two of the individuals recommended by the MHA must be selected to serve on that board. *See* M.G.L. c. 6A, § 34A. 4) If a hospital applies for hardship relief under the statute, it must submit its application to the MHA and the MHA submits such requests to the Massachusetts Rate Setting Commission with a recommended amount of relief. *See* St. 1982, c. 372, § 6 (which appears in a note to M.G.L.A. c. 6A, § 50 (1983–1984 supp.)). 5) The statute does not include a general exception which increases the maximum allowable costs to reflect "costs associated with the funding of negotiated collective bargaining agreements." 6) Hospitals have opposed "salary and other economic proposals submitted by the MNA on grounds that their ability to pay has been substantially impaired by the enactment" of the Massachusetts law. 7) Since the passage of the Massachusetts law, several hospitals "have threatened to lay off or have actually laid off registered nurses, . . . all in reliance upon the restrictions of" the new statute.

The MNA contends that all these aspects of the statute render it in conflict with the Labor Management Relations Act, 29 U.S.C. § 141 et seq., so the state statute is preempted. For the purposes of ruling on defendants' motion to dismiss, the court assumes that one of the purposes of the Massachusetts statute was to bring about some of the occurrences which plaintiff alleges have taken place, namely, a reduction in the number of registered nurses employed by Massachusetts hospitals if the hospitals were unable to continue to pay their existing work forces under the new prospective reimbursement system.

### The LMRA

Since the plaintiff's claim depends on an alleged conflict with the operation or, at least, the purposes of the LMRA, an examination of that statute is essential. The first section of the Act sets out the Congressional declaration of purpose and policy:

Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

It is the purpose of this chapter, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

29 U.S.C. § 141(b).

Other provisions of the statute make it clear that employers are prohibited from interfering with employees' rights to bargain collectively, see 29 U.S.C. § 158(a), and the National Labor Relations Board is given the power to prevent any person from engaging in any unfair labor practice. 29 U.S.C. § 160. Unfair labor practices are listed and specified in the Act. *See* 29 U.S.C. § 158(a) (employers' unfair practices) and (b) (labor organizations' unfair practices). To determine if the Massachusetts statute is preempted by the Labor Management Relations Act, we must consider "the extent to which Congress has placed implicit limits on 'the permissible scope of state regulation of activity touching upon labor-management relations.'" *New York Telephone Co. v. New York Labor Department,* 1979, 440 U.S. 519, 527, 99 S.Ct. 1328, 1334, 59 L.Ed.2d 553, quoting *Sears, Roebuck and Co. v. Carpenters,* 1978,

436 U.S. 180, 187, 98 S.Ct. 1745, 1752, 56 L.Ed.2d 209.

### Preemption Issue

In this case, it is clear that the Massachusetts legislature has sought to regulate the amount of revenue that can be generated annually by the hospitals of the state. State regulation of hospital costs and other health care costs has become widespread and several states have regulatory schemes similar to the Massachusetts approach. *See generally* Schramm article, *supra,* at 633–640 and Table 1. The statute was clearly designed to put pressure on hospitals to cut costs and increase efficiency by decreasing the rate at which hospitals can increase their revenues. This, in turn, obviously puts pressure on the hospitals to decrease the rate at which their costs increase, including their costs of employing nurses and other employees. The question here at issue is whether there is anything in the LMRA which indicates that Congress intended that when such a regulatory statute results in employees' wages rising at a lower rate than the employees would otherwise receive and even results in employers laying off employees, the statute conflicts with the Act and is therefore preempted.

### Particular Claims

■ The MNA's claims that the statute is in conflict with the Labor Management Relations Act because it was lobbied for by the MHA and incorporates the analysis of a contract which was negotiated between the MHA and Blue Cross is without merit. The LMRA clearly states the congressional intent that the expression or dissemination of any views, arguments or opinions are not to be affected by the Act as long as the expression does not contain any "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). Similarly, the First Amendment to the United States Constitution protects individuals' rights to petition their federal and state legislatures to seek to convince the legislatures to pass laws which will be in their interest. *See, e.g., California Motor Transport Co. v. Trucking*

*Unlimited,* 1972, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642. "[U]nder our form of government the question whether a law … should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of the government so long as the law itself does not violate some provision of the Constitution." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 1961, 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464. In *Noerr,* the Supreme Court held that Congress did not intend the antitrust laws to prevent firms from lobbying and disseminating publicity materials designed to convince state legislatures to pass laws even if those laws would cripple their competitors. One of the central reasons for that holding was the Court's reluctance "to impute to Congress an intent to invade" the defendants' First Amendment freedoms. *Id.* at 138, 81 S.Ct. at 530. In the LMRA Congress specifically indicated its intention that nothing in the Act should be so interpreted. *See* 29 U.S.C. § 158(c). The state statute must be examined to see if its effect may be to interfere with rights of the plaintiff which have been guaranteed by the federal statute.

In addition, however, it is important to note that in this case the interests of the MHA and the MNA are, in large part, aligned. The MHA is not a defendant here. The plaintiff seeks an adjudication by this court that the Massachusetts regulatory scheme is in violation of national labor policy because it does not contain a provision whereby the hospitals in Massachusetts can pass-through to patients, commercial insurers, Blue Cross, and the Medicaid program, all wage increases which are negotiated for registered nurses in their collective bargaining agreements with Massachusetts hospitals. There is no reason to believe that Massachusetts hospitals would be opposed to such a provision in the law. *Compare National Union of Hospital and Health Care Employees v. Carey, supra,* 557 F.2d at 281–282. There is also no reason to believe that the MHA would not have wanted such a provision included in HA–29. Such a provision would leave hospitals free to yield

to all reasonable demands made by the MNA during contract negotiations without suffering serious adverse consequences. The increased costs, under such a scenario, would be passed-on to consumers of health care.

■ The next set of MNA challenges to the statute concern the role which the MHA plays in administration of the rate setting program. First, in all situations where the MHA is given a role, that role is merely advisory. The role of the rate setting commission hospital policy review board is to review and comment upon any proposed rule or regulation of the Massachusetts Rate Setting Commission. If the policy review board disapproves of any non-emergency rule or regulation that is proposed, the statute mandates a 21–day delay in issuance of that rule or regulation so public hearings can be held. See M.G.L. c. 6A, § 34A. All of the other functions of the board, such as responsibility to prepare written reports, are merely advisory. Similarly, while the one-year emergency hardship provision in the statute does specify that all requests for hardship relief shall be submitted to the MHA, it also says that all such requests must be submitted to the rate setting commission within sixty days after they are received by the MHA and the only role of the MHA is to recommend to the commission the extent, if at all, the MHA believes the request should be granted. See St.1982, c. 372, § 6, supra. These boards are given no final authority, they simply serve as a means by which the statute seeks to guarantee that the rate setting commission will have well-reasoned comments and reports concerning its proposed rules and regulations in the event that public hearings or other means by which such discussion is solicited yield an incomplete record for evaluating a proposal.

Second, the MHA does not control the advisory boards for which it recommends members, but rather has been designated by the Massachusetts legislature as an organization which can recommend members who will be knowledgeable about the concerns of the MHA's member hospitals, the organizations most directly and explicitly affected by the statute. For example, the rate setting commission hospital policy review board is established by M.G.L. c. 6A, § 34A. The statute specifies that it shall have eleven members. Two are to be designated by the secretary of the executive office of human services. The other nine are to be appointed by the Governor. Of those nine remaining positions, the Governor is to appoint two people from a list of at least six recommendations submitted by the MHA. That section also specifies that three of the remaining nine members are to be "nonproviders with experience in or knowledge of the delivery or financing of hospital services and who shall represent the interests and concerns of business, labor and the elderly, respectively."

Third, the MNA has not alleged that, through its position as a recommender of individuals to serve on these boards, the MHA has in any way interfered with the MNA's efforts to bargain collectively with hospitals which are members of the MHA. Therefore, drawing all possible inferences in favor of the plaintiff as we are required to do in considering the defendants' motion to dismiss, the only possible relevance of the statute's specific inclusion of the MHA as an organization called upon by the statute to participate in an advisory role and to recommend individuals for participation on advisory boards is the possibility that this supports the gravamen of plaintiff's complaint: that the cost containment statute constitutes an impermissible attempt by the Massachusetts legislature to interfere with the balance of power in the collective bargaining process to give Massachusetts hospitals and the MHA an advantage in contract negotiations.

■ An examination of the statute shows that it was passed by the Massachusetts legislature to decrease the overall level of health care costs in Massachusetts. The MNA has tried to characterize the statute as an attempt by the Massachusetts legislature to disadvantage registered nurses and to favor Massachusetts hospitals. That misstates the situation in our view. The

Massachusetts legislature, through this regulatory scheme, was imposed cost constraints on hospitals. These constraints have forced hospitals to become more efficient with the revenue they are allowed to generate under the statutory provisions, and perhaps to reduce the level of health care available to patients. However, the statute, while it does focus on individual costs of hospitals in order to compute the "maximum allowable costs," i.e., the total amount hospitals can charge, does not specify that the individual cost components should move at the "Commission/Harbridge House" rates referenced in HA–29. The statute merely focuses on the individual costs to generate a total, "global" budget figure within which the affected hospitals must operate. The expectation of HA–29 and the statutory scheme has always been that some costs will, of necessity, rise faster than projected by the MAC computation. That is inherent in the concept of a *prospective* reimbursement system.

The regulatory scheme and the attendant rate setting calculations made by the Massachusetts Rate Setting Commission have been substituted by the Massachusetts legislature as the means for determining how much revenue may be generated by Massachusetts hospitals. In other industries, which have not been so affected by the intercession of government programs, both federal and state, into the marketplace, the free market system and free competition decides how much revenue will be generated by firms. Competitive markets discipline inefficient competitors and the price mechanism discourages investment in products and services beyond that desired by consumers. Regulatory schemes substitute direct government control in situations where free competition is thought to be absent, ineffective, or inappropriate for various reasons. *See* I.P. Areeda & D. Turner, Antitrust Law ¶ 107 at 16–18 (1978). Congress and state legislatures have been increasing government regulation of the health care industry for the past two decades. *See* Weiner article, *supra;* Schramm article, *supra.* The regulatory scheme has been substituted, in large part,

for competition between hospitals. Hospitals may still compete, to some extent, for patients, and the regulatory scheme rewards hospitals for minimizing the rate of unused facilities and unoccupied beds. However, hospital charges are controlled. As a result, the hospitals must spend significant efforts convincing the state legislature of their needs and negotiating with the rate setting commission within the constraints imposed by the statute. So, the MNA is correct in arguing that HA–29 and the statute itself in large part reflect the negotiating abilities of the MHA. That is the nature of regulated industries.

As counsel for the MNA points out in its brief, "any restrictions placed on the level of rates necessarily impacts heavily on the level of wage increases." That also is the nature of regulated industries. However, the MNA's assertion that the setting of rates therefore reduces bargaining to a hollow exercise does not follow. The Massachusetts' legislature's right to regulate the health care industry has not been challenged in this case. The issue here is whether the regulatory statute at issue affects the relative bargaining power of management and labor in a way that interferes with the Congress's purposes in enacting the LMRA. This situation is analogous to that where a government regulation imposes additional costs upon the firms in one industry, decreasing their profits and affecting their ability and willingness to agree to salary increases for their employees. We have assumed for the purposes of this motion that the statute in question has similarly affected the ability and willingness of the hospitals in Massachusetts.

The LMRA mandates free collective bargaining. There has been no suggestion that the collective bargaining process has been interfered with or that the statute has adversely affected employees' rights to form labor unions to negotiate with management. The nurses' economic weapon, the work stoppage or strike, has not been affected. On the contrary, the parties advised us that there have been several strikes in recent years by nurses in Massa-

chusetts hospitals. A highly publicized strike by the nurses at Lynn Hospital commenced after oral argument in this case.

### Conclusions

The regulatory scheme in this case may not be the best of all possible system and may need fine tuning or even a complete overhaul. However, it does not interfere with any rights guaranteed by the LMRA or the purposes of that statute. There may be inadequacies in the "Commission/Harbridge House methodology" of computing comparable inflation rates; but that is why regulatory agencies and policy review boards and study commissions have been established by the statute. The modification and administration of a regulatory or rate setting program is the responsibility of the legislature and administrative agencies, not of the courts.

The state statute in this case does not affect the collective bargaining process. Cf. *Machinists v. Wisconsin Employment Relations Commission,* 1976, 427 U.S. 132, 149, 96 S.Ct. 2548, 2557, 49 L.Ed.2d 396. ("[I]t is clear beyond question that Wisconsin '[entered] into the substantive aspects of the bargaining process to an extent Congress had not countenanced.'") In *Amalgamated Transit Union, Division 819 v. Byrne,* executive branch officials of the State of New Jersey made continued receipt of state subsidies to failing transit companies contingent upon those companies omitting a particular contractual provision from their collective bargaining agreements. 3 Cir.1977, 568 F.2d 1025, 1026 (en banc). In that case, the court stated:

> We do not believe that it is fair to imply that Congress would intend to bar New Jersey's conduct in this case as an impermissible infringement upon the rights guaranteed by the NLRA.... New Jersey's interest in the collective bargaining agreements is similar to that of any private purchaser of services which expresses an interest in the terms of a collective bargaining agreement under consideration by the provider of the services.

*Id.* at 1029. The argument that Massachusetts' conduct in this case is not contrary to Congress's intent is much stronger. Here, the legislature has expressed no interest in the terms of the collective bargaining agreements between the MNA and hospitals. The state is concerned only with the total bill paid by those consuming hospital health care services in the state. In addition, the statute was approved by the Secretary of HHS to the extent that it applies to reimbursement for Medicaid patients as required by federal statute, *see* 42 U.S.C. § 1396 *et seq.,* and is consistent with Congress's statement that the states must reimburse hospitals at rates which "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards." 42 U.S.C. § 1396a(a)(13)(A). And, the MNA is free, as are all labor organizations, to negotiate for whatever wage increases and other contractual terms they can get from the hospitals. Of course their wage increases are limited to some extent by how much income the hospitals receive, but that is also the case in all collective bargaining situations, especially where price controls or their equivalent are in effect.

If the hospitals refuse to negotiate and state that they are only willing to increase registered nurses' salaries by the "Commission/Harbridge House" inflation rates, that may be evidence of a lack of willingness to bargain in good faith. *See National Labor Relations Board v. Truitt Mfg. Co.,* 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. However, bad faith conduct is not mandated by the statute. Moreover, any claims that the MHA has not acted in good faith in its collective bargaining efforts with the MNA should be brought before the NLRB. 29 U.S.C. § 160. *See New York Telephone Co. v. New York Labor Department, supra,* 440 U.S. at 528, 99 S.Ct. at 1334.

It is clear that the MNA is indirectly seeking to challenge the state's authority to regulate hospital health care rates. Con-

gress had not forbidden such regulation, but has rather encouraged it. Many states now regulate health care to a significant degree. *See* Schramm article, *supra.* Any regulatory scheme will impact on the revenues earned by hospitals and, therefore, on their ability to grant pay increases to registered nurses. There is a valid state interest in regulating these rates. The Massachusetts statute is, in our view, neutral and permits the "free play of economic forces in the collective bargaining process." *New York Telephone Co. v. New York Labor Department, supra,* at 526, 527, 99 S.Ct. at 1334. The statute does not interfere with national labor policy and there is no evidence that Congress intended that such legislation should be considered in conflict with the LMRA.

Accordingly, the defendants' motion to dismiss is allowed and it is ordered that the case be dismissed for failure to state a claim upon which relief can be granted.