MASSACHUSETTS NURSES ASSOCIATION, Plaintiff, Appellant,

v.

Michael S. DUKAKIS, et al., Defendants, Appellees.

No. 83–1732.

United States Court of Appeals, First Circuit.

Argued Jan. 5, 1984.

Decided Feb. 8, 1984.

Alan J. McDonald, with whom McDonald & Noonan, Boston, Mass., was on brief, for plaintiff, appellant.

William L. Pardee, Asst. Atty. Gen., Government Bureau, with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for defendants, appellees.

Before COFFIN, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Circuit Judge.

The issue presented is whether a new Massachusetts statute aimed at restraining increases in hospital costs impermissibly interferes with the collective bargaining efforts of the plaintiff, the Massachusetts Nurses Association (MNA), in such a way that the statute must be held to be preempted by the Labor Management Relations Act, 29 U.S.C. §§ 141 et seq., and the policies it embodies.

The district court dismissed the complaint in a comprehensive opinion, 570 F.Supp. 628 (D.Mass.1983). We affirm on the basis of the district court's opinion, as supplemented by this opinion.

The Massachusetts statute, Chapter 372 of the Laws of 1982, amending Massachusetts General Laws Chapter 6A, Sections 31 et seq., established as of October 1, 1982 a prospective method of reimbursing hospital costs. Under this system an overall figure of prospective reasonable costs is derived at the beginning of the year by projecting estimates of component costs. The resulting figure, which is called the maximum allowable cost, is the amount that a hospital is allowed to collect for care provided in a given year to all its patients, whatever may be the source of payment. We reproduce in the Appendix the district court's more detailed description of reimbursement procedures under the Massachusetts statute.

The district court traced in some detail the background of both federal and state efforts since 1965 to devise fair and effective means of reimbursing hospitals and of regulating their costs. We note that initially, the federal government reimbursed actual costs; later it moved to reimburse "reasonable costs". Massachusetts developed a new approach. It instituted a federally approved prospective reimbursement plan for Medicaid patients. Subsequently it broadened its plan to cover the costs of non-Medicaid patients, such as those insured by Massachusetts Blue Cross and commercial insurers, as well as self-paying patients, in order to avoid unfairness in the allocation of hospital costs.

The district court summarized the complaint and discussed what we might term the secondary issues raised by the complaint—those allegations charging the Massachusetts Hospital Association (MHA) with lobbying for Chapter 372, challenging the statute's dependence on the criteria of the agreement negotiated between MHA and Blue Cross, and attacking MHA's roles in recommending individuals to serve on a rate setting commission policy review board and in making recommendations for hardship relief to the Massachusetts Rate Setting Commission. We see no useful purpose served in repeating the discussion of these matters. We adopt the entire opinion and restrict our additional discussion to some further analysis of the law of preemption applicable to this case.

We observe first that no contention is advanced that the state law we are dealing with is in a field which Congress has evidenced an intent to occupy. Cf. Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). We confront, rather, the contention that this state law is preempted to the extent it actually conflicts with federal law. Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Thus we are faced with the argument that Chapter 372 "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress", Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), in enacting the Labor Management Relations Act.[1]

1. Since "an obstacle" might be said to range from cracks in the highway to an impassable crevasse, we find some illumination in the fol-

The objectives of Congress relevant to this case were recently identified in *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 140 n. 4, 96 S.Ct. 2548, 2553 n. 4, 49 L.Ed.2d 396 (1976), where the Court endorsed the following quotation from Cox, *Labor Law Preemption Revisited,* 85 Harv.L.Rev. 1337, 1352 (1972):

> "An appreciation of the true character of the national labor policy expressed in the NLRA and the LMRA indicates that in providing a legal framework for union organization, collective bargaining, and the conduct of labor disputes, Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes that would be upset if a state could also enforce statutes or rules of decision resting upon its views concerning accommodation of the same interests."

Our national labor policy is, in other words, a set of Marquis of Queensberry Rules, covering rights, procedures, and practices which are to govern the adversarial contestants. 29 U.S.C. § 141(b) could not be more clear: "It is the purpose . . . of this chapter . . . to prescribe the legitimate rights of both employees and employers . . . to provide orderly and peaceful procedures . . . to protect the rights of individual employees . . . to define and proscribe practices . . . and to protect the rights of the public . . . ."

It is not surprising, therefore, that the cases cited by plaintiff where preemption on the basis of frustration of labor policy objectives has been found are cases where states acted to proscribe activities which, though left unregulated by federal law, directly affected the balance of power between the participants in the bargaining process. In *Local 24, International Brotherhood of Teamsters v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), the offending state statute, though nominally an antitrust measure, was held to have impinged on a carrier's contract clause whose long bargaining history required that it be considered a permitted wage provision, beyond the reach of the state. In *Local 20, Teamsters Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the Court held preempted a secondary boycott law that filled a gap that Congress had intended to leave vacant. Similarly, in *Machinists, supra,* the offending state law aimed to penalize workers for refusing overtime work—conduct Congress intended to leave free to play its part in any struggle. Our case, however, does not involve this sort of state interference with the rights of labor or management. Chapter 372 affects the labor-management relationship only indirectly through its regulation of the employers' annual gross income.[2]

The district court placed considerable emphasis on *Amalgamated Transit Union, Division 819 v. Byrne,* 568 F.2d 1025 (3d Cir. 1977) (en banc), in which the Third Circuit went so far as to hold that a state governor had not violated federal labor policy when he threatened to cut off state subsidies to any transit company that agreed with a union to include an open-ended cost of living increase provision in its collective bargaining agreement. Such a holding, arguing the imposition of a state-mandated

---

lowing footnote to the initial use of these words:

> "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect— the state law must yield to the regulation of Congress within the sphere of its delegated power." *Hines v. Davidowitz,* 312 U.S. 52, 67 n. 20, 61 S.Ct. 399, 404 n. 20, 85 L.Ed. 581.

**2.** MNA argues that, had it not been for very strong legislative history in *New York Telephone Company v. New York Department of*

*Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) a majority of the Justices would not have excluded from preemption New York's law which at once provided unemployment benefits to striking employees and placed the major burden on the struck employer. We reject this invitation to speculate but observe that giving strikers financial assistance far more intimately and directly affects the balance of forces in a collective bargaining context than the general hospital cost containment approach embodied in Chapter 372.

wage policy on employers, would seem to us to resolve a considerably more difficult issue than that in the instant case where an overall cost ceiling on total operations is the only state objective.

What impresses us even more is that even the dissenters would seem to find little difficulty with our case. Judge Aldisert, writing for himself and two other judges, said:

"[T]here exists a critical difference between a state communicating to all affected parties the extent of finances it intends to grant for carriers' operations and a state communicating that it will not continue its subsidization if the carriers agree with the unions to retain uncapped cost of living clauses in their employment contracts. The former communication presumably does not constitute interference with negotiations over wages and working conditions, as it is not a state attempt 'to influence the substantive terms of collective bargaining agreements'." 568 F.2d at 1035 (Aldisert, J., dissenting).

Judge Adams, if anything, went even further in saying:

"In the context of an industry heavily subsidized by the state, a large number of statements of governmental policy could alter in some sense the economic forces or influence the terms which negotiating parties may reach. To establish a violation of the NLRA, however, the unions would first have to allege and then demonstrate that the state officials attempted to *dictate* specific terms of the collective bargaining agreement ...." 568 F.2d at 1042 (Adams, J., dissenting) (emphasis in original).

We therefore look on *Byrne,* whether we focus on the majority or dissenting opinions, as authority against preemption in this case. The state legislation involved here, unlike that in all the cases we have cited, is oriented toward neither labor-management issues in general nor wages in particular. The subject of hospital cost containment,

for the benefit of all citizens, lies within "the historic police powers of the States [that are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress", *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); it is an "interest[ ] so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we [can] not infer that Congress ... deprived the States of the power to act." *San Diego Building Trades Council v. Garmon, supra,* 359 U.S. at 244, 79 S.Ct. at 779 (footnote omitted). The local policy at stake here is most assuredly as weighty as the state's interest in avoiding the construction of uneconomic nuclear power plants in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* —— U.S. ——, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), and the state's interest in the continued availability of punitive damages in tort cases in *Silkwood v. Kerr-McGee Corp.,* —— U.S. ——, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). In both of these cases of course the Supreme Court found no federal preemption.

There is, however, more than deference supporting the state's position. Just as, in *Silkwood,* the Court could conclude that "Congress clearly began working on the Price-Anderson legislation with the assumption that in the absence of some subsequent legislative action, state tort law would apply", —— U.S. at ——, 104 S.Ct. at 623 (footnote omitted), so in this case it is clear that Congress worked on the assumption that states would develop the kind of overall cost control that Chapter 372 constitutes. The district court has summarized the relevant history of increasing Congressional concern in containing hospital costs. By 1980 the Comptroller General recommended prospective rate setting (the essence of the Massachusetts approach) to Congress.[3] After much study and debate, Congress enacted prospective reimbursement legislation

---

**3.** Comptroller General, *Report to the Congress of the United States: Rising Hospital Costs Can Be Restrained by Regulating Payments* *and Improving Management* (HRD–80–72, 1980).

for Medicare on April 20, 1983. That statute, 42 U.S.C. § 1395ww, parallels Ch. 372, which was effective October 1, 1982, in that it provides for the establishment of a prospective cost figure in advance that will be paid hospitals regardless of costs actually incurred. We do not see how Congress could contemplate a prospective reimbursement system—with no provision permitting wage increases to be "passed through" to consumers—without at the same time contemplating the kind of state legislation represented by Chapter 372. Nor did appellant MNA attempt to help us on this point.

Finally, aside from precedent, deference, and the intent to be derived from federal legislative evolution, we sample the implications of appellant's reasoning. First of all, in any industry the price of whose product or service—such as electric power, telephone, natural gas, or even rent controlled real estate—is regulated, a state would find its regulatory system vulnerable to preemptive attack on the ground that the overall control of price was too inhibiting an influence on collective bargaining. Logic, however, would carry beyond simple price control. Any state or municipal program that substantially increased the costs of operation of a business in a competitive market would be similarly vulnerable to the preemption argument. Clean air and water laws, selective cutting requirements in forest operations, industrial safety standards, tax increases—all pro tanto hobble collective bargaining in that they constitute part of the universe in which collective bargaining takes place, just as do general prosperity or depression. But they do not add to or detract from the rights, practices, and procedures that together constitute our collective bargaining system.

We would, as did the district court, add the caveat that any pretextual, arbitrary, or capricious invocation of Chapter 372 as an excuse for refusal to bargain over wages or working conditions would present quite a different case, subject to different principles. The complaint in this case does not suggest such a situation.

*Affirmed.*

### APPENDIX

#### The Massachusetts Statute [1]

In 1981, the MHA and Massachusetts Blue Cross (hereinafter "Blue Cross") signed an agreement which set for each MHA hospital a formula for computing a prospective "maximum allowable cost", which represented the total annual payment Blue Cross would make to that hospital in the upcoming year. *See* Blue Cross of Massachusetts Hospital Agreement 29 Section I.U. at 29 (October 1, 1981) (hereinafter referred to as "HA–29"). That agreement was approved by the Massachusetts Rate Setting Commission. With Medicaid payments limited by Massachusetts' prospective reimbursement system as approved by the Secretary of HHS and payments by Blue Cross limited by the prospective reimbursement system outlined in HA–29, hospitals were expected to pass all additional costs on to commercial insurers and self-paying patients. Because of that concern, the Massachusetts legislature passed the statute the MNA is here challenging. The legislation at issue uses HA–29 as a model, but, in effect, increases the scope of the agreement, because as incorporated into the legislation, it now governs the payments to hospitals from all classes of patients, including the Medicaid payments, payments from Blue Cross and commercial insurers, and payments from private, self-paying patients. The legislation incorporates the analysis and even specific portions of HA–29 as the means by which the Massachusetts Rate Setting Commission must make an annual determination of the amount which will be paid to each Massachusetts hospital. The legislation is an attempt to establish a common level of charges for hospital services independent of whether the patient's bill will ultimately be paid by Medicaid or Blue Cross or by the patient himself.

---

1. This description of the Massachusetts statute is taken from the opinion of the district court,

570 F.Supp. 628 (D.Mass.1983).

*See* Mass.Gen.L.c. 6A, § 53, as amended August 10, 1982 ("The commission shall require that charges for health care services rendered in each acute hospital shall be uniform for all patients receiving comparable services.") Because the legislation establishes the state's plan for reimbursement under the Medicaid program, implementation of the new law was made contingent on the Secretary of HHS approving it, as required by the federal laws governing Medicaid. That approval was granted, and law became effective on October 1, 1982.

The challenged statute, like HA–29, operates by computing a "maximum allowable cost." The statute sets the fiscal year 1981 as a base period and uses hospitals' reimbursable costs for that period [2] as the "maximum allowable costs" for 1981, a reference point for computing hospitals' reimbursable costs for all future years. The 1981 "maximum allowable cost" figure ("MAC") is then adjusted by a formula that is set forth in Article IV of HA–29. The formula divides the costs that make up the 1981 MAC into several categories, and adjusts each individual component of hospital cost by reference to an individually determined inflation factor for that year. Different inflation factors are applied to each category of costs.

The statute sets the inflation factors by reference to formula set out in HA–29, which in turn refers to the "Commission/Harbridge House methodology of 79 cost categories." HA–29, *supra,* Article IV. A.4.b.i. at 32. Appendix J of HA–29 lists the categories and explains how the inflation adjustment factor for each category is computed. For example, to compute the adjustment for registered nurses, the aggregate percentage change in the average annual salaries of chemists, engineers and accountants are considered. The data is obtained from the Bureau of Labor Statistics and the National Survey of Professional, Administrative, Technical, and Clerical Pay. *See* HA–29, *supra,* Appendix J, Cost Categories, Economic Change Indicators and Explanatory Variables for Forecasting § .03 at 203.

The statute, incorporating the HA–29 approach, takes the 1981 base year costs, adjusts the costs in the respective categories by the inflation factor applicable to that category, then adjusts for other costs, such as wage parity costs,[3] and factors them into the calculation. These costs are then added up and the total, or global figure, constitutes the MAC for fiscal 1982, the amount that the hospital will be able to collect for the care provided to all of its patients during 1982, regardless of the source of payment. The MAC for fiscal 1982 is, in turn, adjusted under this formula and, as adjusted, it yields the MAC for fiscal 1983. The statute, however, incorporates an additional cost-cutting feature. The statute provides that the revenue approved for each hospital shall be reduced annually by a "productivity factor".[4] These "productivity factors" were included to force a gradual overall improvement in hospitals' efficiency and economy.

2. The Fiscal 1981 reimbursable costs are adjusted to some extent to take account of the fact that certain expenses were not incurred throughout 1981, but were only incurred for part of the year. These costs are annualized, or projected as if they were incurred all year long, in the calculation of the 1981 "maximum allowable cost." *See* HA–29, *supra,* Article IV. A.4.a.i. at 29.

3. Wage parity adjustments and other similar adjustments are intended to improve the validity of a base year figure as a number upon which to base future year estimates. Because certain costs do not rise smoothly, but rather make occasional significant increases, adjustments were made to bring costs into line with the Harbridge House figures for the period pri-

or to 1982. For example, the base year figure for registered nurses was increased by an additional 15.78% because during the preceding three years actual costs of nurses' salaries had not increased as fast as the statutory proxies. *See* HA–29, *supra,* Article IV.A.4.b.iii. at 32.

4. It is difficult to parse the complicated statutory provisions, but it appears that the statute requires that the productivity factors are 1.4% in fiscal 1983, 2% for fiscal 1985, 2% for fiscal 1986, 2% for fiscal 1987, and 1% for fiscal 1988. *But see* Caper & Blumenthal article, *supra,* at 542 (the statute "requires that the revenue approved for each hospital be reduced by 0.5 to 2 per cent each year for the next six years, to a total reduction of 7.5 per cent.")